Woods *v.* Forest Hill Cemetery, Inc.

(*Jackson,* April Term, 1945.)

Opinion filed March 2, 1946.

414

GRAHAM MOORE and T. L. CAMPBELL, both of Memphis, for plaintiff in error.

ALBERT F. JOHNS and WALTER P. ARMSTRONG, both of Memphis, for defendant in error.

MR. JUSTICE NEIL delivered the opinion of the Court.

This suit originated in the Circuit Court of Shelby County, in which the plaintiff Sam Woods sued the defendant for damages for personal injuries based upon the following facts, as found by the court of appeals:

"The premises on which the injury occurred to the plaintiff, and which was owned by the defendant, consisted of a dwelling located in Memphis divided into two apartments, which are identified as 1517 and 1519 Carr Avenue. 1517 which was the upper apartment was leased to Mrs. Alvin Bick and 1519 the lower apartment was leased to Mrs. F. B. Jones. To the rear of the dwelling there was a double garage with two apartments above it. Each lease contract provided that the same was rented

'with the privileges and appurtenances thereunto belonging'. Under this Mrs. Bick was in possession of the west side of the garage and the west garage apartment, and Mrs. Jones in possession of the east side of the garage and the east garage apartment.

"There was a porch on the south side of the garage apartments and on the east side there was a stairway leading up to the porch. There was a railing or bannister extending along the east side of the stairway and around the porch. This railing or bannister was about three feet high and was made of two by four timbers.

"The two apartments designated as 1517 and 1519 were first rented to Mrs. Bick and Mrs. Jones respectively October 1, 1938, and were continuously occupied by them until after the injury to the plaintiff occurred.

"Will Williams [subtenant in one of the garage apartments] was a carpenter and had employed the plaintiff, Sam Woods, to assist him in painting a house across the street from the apartment where he lived.

"About the time they started to work it began raining and Will Williams, Sam Woods and Dexter Burns, another employee of Williams, went to Will Williams' apartment. After sitting in the apartment for a short time the three went out on the porch to view the weather and to see whether they would be able to work that day.

"As to the immediate facts of the injury the plaintiff testified: 'A. He said "Come back tomorrow." Well, when Will Williams and Dexter went to this side, near the east or south side, why that is the way this bannister runs, north and south, well they went over there and leaned up on the bannister while I went over to the side right here in the east part and the stairs go down here (indicating) and this bannister, I don't know, about four or five or six feet, something like that, I didn't measure it,

but I leaned up on the bannister this way, looking east, at the weather, and I turned around and went to put this elbow up on it and it broke, and there was no way for me to catch and I went right down on the sidewalk.' "

The fact that the banister was "rotten" is undisputed. Likewise, it is beyond dispute that plaintiff's fall, and consequent injury, were proximately caused by the defective condition of the porch and banister. The lease in question was executed by Mrs. Jones and by Percy Galbreath & Sons as agents for the defendants. It was to take effect October 1, 1942, and was for the term of one year. It contained the following covenant: "The said tenant covenants that he will not allow the premises to be used for any purpose that will increase the rate of insurance thereon, nor for any other purpose than that herein specified, nor to be occupied in whole or in part by any other person, and will not sublet the same, nor any part thereof without the landlord's consent in writing."

B. F. Cornelius testified that he was the son-in-law of Mrs. Jones and that he and his wife and Mrs. Jones had occupied the apartment Number 1519 continuously since April 1, 1938. He had managed Mrs. Jones' business since her husband's death in 1921. It appears that he was not only the agent of Mrs. Jones in renting the the apartment, but was an agent and servant of Percy Galbreath & Sons at the time, and continued in their employment until a short time before the plaitniff was injured. He was asked if the agents of the cemetery company had ever complained to any one about tenants' occupying these garage apartments. He replied they had not and "they explained to me that we had a right to rent it to anybody we wanted to." Counsel for defendant objected and the evidence was excluded "under the parol evidence rule". The trial judge entertained the view

that these conversations were merged in the written agreement and that they violated the terms of the written lease. The witness further testified that Galbreath & Sons knew these garage apartments were being occupied by tenants all the time that Mrs. Jones had the property under lease. This testimony was objected to and the objection sustained. He testified that he had told the agents about the condition of the premises around the garage apartments, saying, "I said the backstairs, Williams', are in bad shape and unless you repair them you are going to have an accident." Following this statement Galbreath & Sons sent men out there and they made repairs on some of the risers "and they put a railing going upstairs to the entrance to the two apartments, you see, the two rooms." He was asked if any repairs were made on the railing of the east side or on the south side of the porch. Answer: "There were none."

Mrs. Bick, who rented the other side of the apartment building, which is Number 1517 Carr Avenue, testified that the west side of the garage and the upper apartment over it were appurtenances which went with her lease; that there were tenants in this apartment as well as the one on the other side, or the east side when she moved in. Asked as to repairs on the apartment, she said, "Every time anything happened I called them," meaning the agents, Galbreath & Sons. At one time she called them and they made repairs on the screens and windows in her upper garage apartment.

It is further shown that the agents of the property owner employed a janitor for these respective apartments, who fired the furnaces; that his services "went with the lease". She stated without objection that no one from Galbreath & Sons or Forest Hill Cemetery Company ever complained to her about sub-letting the apartment.

It thus clearly appears from the testimony of Mr. Cornelius and Mrs. Bick that the agents of the defendants made repairs on the property when called upon; that the owner employed a janitor to fire the furnace and do other things incident to his employment for the benefit of the lessees. It was while Cornelius was an employee of the agents of the defendant that repairs were made on the steps and railings of the stairway, except no repairs were made on the east end of the porch from which plaintiff fell and was injured.

There is no escape from the conclusion that Percy Galbreath & Sons knew that the two upper garage apartments were occupied by tenants from 1938 until after plaintiff was injured. We think it clearly appears that the stairway leading to these two apartments was a common passage way for the benefit of tenants and subtenants who occupied them, as well as other persons who were lawfully upon the premises as invitees. Moreover, the fact that the agent of the owner repaired these steps, as well as windows and screens of the apartments, tends to show that the owner recognized that it was obligated to make necessary repairs.

At the conclusion of the plaintiff's evidence the defendant made a general motion for a directed verdict in its behalf. The trial court sustained the motion, holding "that there was no notice brought home to Galbreath & Co., or the defendant, the owner of the premises, that there were any sub-tenants back in these garage apartments during that period," (from October, 1942, to October, 1943). "Now the lease carries a provision against sub-letting unless same is secured in writing. There is no proof that that was secured in writing, and I am of the opinion that there was no waiver of the terms

in this lease on the part of the landlord or the landlord's agent, Galbreath & Co. So I am of the opinion that the directed verdict should be granted on that ground of the motion.''

The trial judge pretermitted the question of plaintiff's contributory negligence and also whether or not defendant was obligated to keep in repair the stairway leading to the garage apartments.

The plaintiff moved the court for a new trial, which was overruled, and thereupon an appeal was prayed and granted to the court of appeals. That court affirmed the judgment of the lower court. The plaintiff filed his petition for *certiorari* to review the alleged error of the trial judge in directing a verdict in favor of the defendant. The defendant also petitioned the Court for *certiorari* to have the Court consider the question of plaintiff's contributory negligence as a bar to his right of action. *Certiorari* was granted to both plaintiff and the defendant and the questions raised in their petitions have been fully argued.

We think the learned trial judge was in error in sustaining defendant's motion to dismiss the plaintiff's suit on the ground (1) that neither the landlord nor his agent had notice that the garage apartments were being occupied by sub-tenants contrary to the terms of the lease, and (2) that ''there was no waiver of the terms of the lease on the part of the landlord, to the effect that the premises would not be sub-let without the written consent of the landlord.''

██ ██ The trial court in determining the question of liability construed the terms of the lease contract most strongly against the plaintiff and in favor of the owner. Both the court of appeals and the trial court failed to observe the general rule that covenants against sub-

letting are strictly construed against the lessor. In 32 Am. Jur., Landlord and Tenant, Sec. 397, it is said, "They are construed with the utmost jealousy, and very easy modes have always been countenanced for defeating them." We think the trial court correctly held that the restriction in the lease against sub-letting could not be changed or modified by proof of a parol agreement. Parol evidence of such understanding, however, would be competent upon the question of waiver.

In *Merritt* v. *Kay*, 54 App. D. C. 152, 295 F. 973, it was held, "A waiver of a covenant against subletting may be proved by parol or other evidence dehors the contract." See also *Mattox v. Wescott*, 156 Ala. 492, 47 So. 170, 16 Ann. Cas. 604, wherein it was said, "A provision of a lease that the lessee shall not underlease without the lessor's written consent is for the lessor's benefit, and can be waived by parol."

Now in the instant case it is shown by credible evidence that Cornelius, who was employed by the agents of the defendant, knew that the apartments had been subleased to tenants; the janitor, who was on the premises continuously and who was the servant of the defendant, knew of the subletting prior to 1942 and thereafter. While it is doubtless true that he had no authority to contract with any one about subletting, yet his knowledge of the fact that the apartments were being occupied must be imputed to the landlord. Moreover, it is shown, and not denied, that following the injury to plaintiff the defendant continued to lease the premises with full knowledge of the fact that the garage apartments had been occupied and would, under the new lease, be occupied by the same sub-tenants. Instead of claiming a forfeiture when Sam Woods was injured on the ground of breach of covenant in the lease, the defendant entered into a new lease with

the knowledge that Will Williams was then a sub-tenant of the lessee. There is no evidence that the landlord objected to his remaining as sub-tenant under the new lease.

■ In *Brokamp* v. *Linneman et al.*, 20 Ohio App. 199, 153 N. E. 130, 131, it was held, ''If, after knowledge of the breach, the lessor, prior to taking any action to forfeit the lease, accepts rent from the lessee, or his assignee, which rent accrued after the breach, he waives the right of forfeiture.'' See also to the same effect, *Pearson* v. *Sullivan*, 209 Mich. 306, 176 N. W. 597, 9 A. L. R. 438. In the latter case the court quotes with approval from 18 A. & E. Encycl. of L., 2d Ed., Landlord and Tenant, p. 382:

''Acts Constituting Waiver—(1) In General.—It may be stated as a general rule that where the lessor, after knowledge of the breach of a covenant or condition for which he could enforce a forfeiture, expressly or impliedly recognizes the continuance of the tenancy, he thereby waives the forfeiture for such breach, and is afterwards precluded from asserting it. . . .

''Intention of Lessor.—The question whether the landlord intended to waive the forfeiture is not material. Where his act amounts to a waiver of the forfeiture or a recognition of the continuance of the tenancy he is precluded from asserting that it was not his intention to waive the forfeiture. Thus, the receipt of subsequent rents is held to constitute a waiver though the landlord expressly states, at the time of such receipt, that he does not intend to prejudice his right to assert the forfeiture.''

■ It is earnestly argued by counsel for the defendant that Williams who subleased the east upper garage apartment was unlawfully upon the premises; that the plaintiff Sam Woods was likewise present in said apart-

ment without any lawful right and must be regarded as a licensee and not an invitee. The argument is made upon the theory that the sub-letting to Williams was in violation of the restrictive clause in the contract. The insistence must be regarded as unsound in view of the waiver of this provision in the contract. We are unable to follow the further contention of counsel that Sam Woods was a licensee even though it is shown that the restrictive clause was waived by the lessor. No authority is cited in support of the foregoing contention. If the provision was waived, it was a recognition of sub-lessee's lawful right to be upon the premises as a tenant and if he is lawfully there, his invitee was likewise lawfully present. The effect of such waiver, with full knowledge of the breach, is 'an affirmation by him that the contract of lease is still in force, and he is thereby estopped from setting up a breach in any of the conditions of the lease and demanding a forfeiture thereof.'' 16 R. C. L., Landlord and Tenant, Sec. 653.

It is next insisted by the defendant, ''We say that the liability, if any, in such case must be based upon the narrow grounds of letting defective premises, even though the sub-tenant be considered rightfully on the premises, because not only did defendant not retain, either expressly or impliedly, control of the balcony, but there was no other way in which an obligation to repair could be raised.''

██ ██ This brings us to a consideration of the question of the landlord's obligation to repair the premises and for alleged negligence in keeping the premises in a safe condition. It must be conceded as a general proposition that, in the absence of a contract to make repairs, there is no obligation resting upon the owner of leased premises to make them tenantable. It has been held in

many cases that the rule of *caveat emptor* applies and the lessee takes the premises as he finds them. The foregoing rule, however, has no application where the premises are leased to different tenants and the stairways, passages, and hallways, and other portions thereof are reserved by the lessor for the use in common of the different tenants. The weight of authority is to the effect that it is the duty of the landlord to keep in good repair and safe condition such common passage ways. The determinative question raised by counsel for defendant is largely one of fact, that is, (1) whether or not the porch and balcony from which plaintiff fell was a common passage way and under the control of the landlord, and (2) was it negligently maintained? We think it is clear from the facts that it was not under the control of either of the tenants or their respective sub-tenants; the balcony and stairs were a common passage way for both sub-tenants and invitees. Moreover, we find material evidence in the record to the effect that the landlord readily responded to the request of the lessee to make repairs on the stairway, banisters, etc., thereby justifying the reasonable inference that what it did was in the performance of a recognized legal duty.

■ In the light of these undisputed facts, we will construe the contract between the landlord and tenant as they construed it, as shown by their conduct, as well as other circumstances relating to the occupancy of the premises. If the defendant thought it was its duty to make repairs why should this Court entertain a different view? A waiver may be evidenced by the conduct of the lessor. 35 C. J. 1078.

■ ■ When the landlord undertook to repair the stairway in question, we think the tenants and sub-tenants were by this act re-assured, and justified in assuming,

that the stairway and railing had been made reasonably safe. *Stern* v. *Miller,* 60 Misc. 103, 111 N. Y. S. 659. The repairs in the instant case were made, according to Ben Cornelius, in the spring before he left Galbreath & Sons in 1942. These repairmen and agents of the landlord, had they exercised only a little care, could have discovered the defective banister. We feel entirely warranted in holding that the defendant had at least constructive notice that the banister on the east side of the porch was in an unsafe, if not dangerous, condition.

The cases are abundant to the effect that the landlord is liable in damages caused by the defective condition of common passage ways of which he has actual or constructive notice. *Burke* v. *Hullett,* 216 Ill. 545, 75 N. E. 240; *Hicks* v. *Smith,* 158 App. Div. 299, 143 N. Y. S. 136.

The obligation of the landlord as to the safe condition of that portion of the leased premises used by tenants in common extends to persons boarding and lodging with a tenant. *Karp* v. *Barton,* 164 Mo. App. 389, 144 S. W. 1111. In the latter case a child of a person boarding with a tenant was injured by a porch used in common by different tenants. See also *Mullins v. Nordlow,* 1916, 170 Ky. 169, 185 S. W. 825. To the same effect plaintiff has cited *Reynolds* v. *Land M. & T. Co.,* 114 Conn. 447, 159 A. 282, 284. In this case the court, speaking of the landlord's lack of knowledge of the defect, said 'Ignorance of the condition is not in itself a legal excuse, and, if want of actual knowledge was the result of its own negligence, knowledge will be imputed.'' *Shortz* v. *Slobodien,* 107 N. J. L. 512, 154 A. 823; *Gillespie* v. *Plotka,* 157 A. 175, 9 N. J. Misc. 1230; *Breisch v. Helfrich* (Mo. App.), 6 S. W. (2d) 978; *Hunter* v. *Schuchart* (Mo. App.), 267 S. W. 411, 413. In the latter case, opin-

ion by the Missouri Court of Appeals, the landlord maintained an outside porch for the common use of tenants occupying the fourth floor. The plaintiff was injured by defects in the railing to the porch. It was there insisted that there was no negligence shown. In considering this question it was held that the obligation was *imposed by law* upon the landlord to keep said porch in a reasonably safe condition for the use of his tenants, *"and of other persons who were rightfully using it in the exercise of due care and having lawful business on the premises."* (Italics ours.)

 We think counsel for the defendant is mistaken in the view that liability in the instant case "must be based upon the narrow grounds of letting defective premises, even though the sub-tenant be considered rightfully on the premises." If this were a lease to only one tenant, and the contract silent as to repairs, a waiver of the restrictive clause forbidding a sub-lease would impose no liability on the lessor to keep the premises in a safe condition. But we are confronted with an entirely different situation wherein the defendant executed a lease to two tenants, including the common passage way leading to two separate apartments. The duty devolving upon the landlord to keep the porch and common passage way in a reasonably safe condition is not necessarily a contractual obligation, but is a duty imposed by law. *Hunter* v. *Schuchart, supra.* It is immaterial whether the persons occupying these upper garage apartments were servants of the lessee, or paying rent as sub-tenants of the lessee, the duty to keep the common passage way reasonably safe for them, and others lawfully upon the premises, continued following the waiver of the right by the landlord to claim a forfeiture.

Counsel for defendant insists that plaintiff's suit is barred by reason of his own contributory negligence, citing *Dixon* v. *Lobenstein et al.*, 175 Tenn. 105, 132 S. W. (2d) 215. In that case the court sustained a demurrer to the declaration on the ground that plaintiff alleged certain facts which conclusively showed that she knew of the defective condition of the railing, and with full knowledge of it rested the entire weight of her body upon it, thereby causing the railing to give way. In the instant case the plaintiff was not, in our opinion, making any such improper use of the porch railing. The learned trial judge, from his observation of the plaintiff, may have thought he was putting too much weight upon it and was guilty of some negligence, but we think the question of contributory negligence of the plaintiff was for the jury.

We are constrained to sustain the plaintiff's assignments of error and accordingly reverse and remand the case for a new trial.