# ROBINSON et al. v. TATE.—236 S. W. (2d) 445.

Western Division, at Jackson.   March 16, 1950.

Petition for Certiorari denied by Supreme Court, December 9, 1950.

216

L. E. Gwinn, of Memphis, for plaintiff in error.

W. Vincent Beal, Chandler, Shepherd, Heiskell & Williams, all of Memphis, for defendant in error.

SWEPSTON, J.   This appeal in error is by the defendants below, against whom plaintiff recovered a verdict and judgment in the amount of $1,700 for damages to her merchandise and fixtures caused by steam escaping from an alleged defective radiator valve.

Defendants' motion for a new trial was seasonably made and overruled and the defendants have appealed and filed eleven assignments of error.

"Plaintiff's declaration alleged that defendants, Thomas L. Robinson, John E. Robinson and P. M. Robinson were the owners and operators of the Robinson Building, located at 160 Union Avenue, Memphis, Tennessee;

"That plaintiff leased from the defendants a space on the ground floor of the building, in which she operated a blouse shop, specializing in the sale of high-grade blouses, skirts, stockings and other related items;

"That this space was rented to plaintiff and her sister on or about July 18, 1947, for a period of one year from August 1, 1947, to July 31, 1948, with privilege of renewal for additional year;

"That defendants, as lessors, agreed to furnish heat for the space rented to plaintiff, and a radiator and pipe connected to the central heating plant in the Robinson Building were located in the space rented to the plaintiff;

"That about the time heat was turned on in said building for the Fall, plaintiff noticed that condensed water sometimes formed on the inside of the glass door and plate glass windows in the space rented by her, this being called to the attention of defendants and an inspection made to discover the cause thereof; that later the attention of defendants was directed to the fact that one of the radiators formerly located in the blouse shop had been removed from the pipe connected with the central heating system and that no cap had been put on the end of said pipe and that steam at times escaped from the valve on the pipe despite all efforts to keep it closed;

"That defendants were notified of this condition and promised to have the pipe capped; that defendants did

not have the pipe capped until more than two weeks after the alleged damage to plaintiff's goods occurred;

"That when the plaintiff closed her shop on the evening of November 8, 1947, said valve was closed tightly as it could be and no steam was escaping. However, by 7 o'clock a. m. the following morning, Sunday, November 9, 1947, the plaintiff's shop had become completely filled with hot steam which escaped through the valve on the uncapped pipe and thoroughly and completely saturated everything in the plaintiff's shop;

"And that, as a result of the escaping steam, plaintiff's goods and fixtures were damaged in the amount of $4,000.00.

"The declaration further alleged that this pipe was under the control of the defendants, and the defendants having such pipe under their control and knowledge, or having a duty to know, that great damage would be done if steam escaped from said pipe, negligently and wrongfully failed to inspect said pipe and maintain it in a proper and safe condition and negligently and wrongfully fired the furnace in the Robinson Building and sent large quantities of hot steam into said pipes which they had negligently and wrongfully failed to inspect and maintain at a time when they knew there was no one in the plaintiff's shop to discover whether said pipe and valve were leaking; that the defendants were negligent in that they, having said pipe under their control, negligently allowed said pipe to remain uncapped while hot steam was being forced into said pipe when the defendants knew, or in the exercise of reasonable care should have known, that the valve on the end of said pipe had leaked or was likely to leak, permitting raw hot steam to escape into the plaintiff's shop; that the defendants were negligent in that they themselves had negligently re-

moved the aforesaid radiator and had negligently left said pipe uncapped while the building was occupied by a former tenant and knowing that said pipe was uncapped, that said pipe had leaked during the preceding winter and would continue to leak so long as it remained uncapped and knowing that the plaintiff did not know the aforesaid dangers, rented said building to the plaintiff and thereafter while she was occupying the same so fired the furnace in the Robinson Building as to send hot steam into said pipe, without advising the plaintiff of said facts and without repairing and remedying the aforesaid dangerous situation which was known to the defendants.

"The defendants filed pleas of not guilty and contributory negligence.

"In response to motion of plaintiff, defendants also plead specially. There were four of these special pleas. The first was as follows:

" 'For special plea, defendants allege that plaintiff occupied the premises described in the declaration under a written lease, executed between plaintiff and defendants July 18, 1947, which contained the provision, "the lessee accepts space as is," and the further provision set out in section or paragraph 21 of that lease, which is as follows:

" ' "The Lessor reserves the right during the term of this lease, to enter said premises at reasonable hours to show the same to other persons who may be interested in renting or buying the property, and for the purpose of inspecting the premises and to make such repairs, additions or improvements as Lessor may deem necessary for the protection and preservation of the said building and premises; but Lessor is not bound to make any repairs whatever nor to be held liable for any damage in conse-

quence of leaks, or for the stoppage of water, sewer, gas or drain pipes by reason of freezing or any other cause or obstructions, nor for any other defects about the building and premises, the Lessee having examined the same and being satisfied therewith, but should such leaks, obstructions, freezing, stoppages, or other defects about the building and premises occur during the term of this lease, or while the Lessee is occupying the premises, then the Lessee shall remedy the same promptly at the Lessee's expense unless the Lessor by written agreement undertakes to do the same.''

'' 'And defendants will rely upon the terms and provisions of said lease and particularly the provisions herein specifically referred to which had not been changed or modified at the time of the alleged damages sustained by plaintiff. Said lease was executed in triplicate, one copy thereof being retained by plaintiff, and will be introduced at the hearing without other or further notice.'

''The second special plea alleged that there was no defect in the valve referred to in plaintiff's declaration and that any steam escaping therefrom resulted from the negligence of defendant in failing to close said valve and keep it closed.

''The third plea, among other things, alleged that neither the defendants nor their agent for the management and operation of the building were notified of any claimed defect in the pipe or valve and denied that either they or their agent made any promise to repair the same.

''The fourth special plea averred that, under the lease contract, it was the duty of plaintiff to make repairs and if the dangerous condition existed, as alleged in her declaration, she was guilty of contributory negligence in con-

tinuing to operate her business for two weeks after the date the premises were alleged in her declaration to have been made and broken.''

Defendants have eleven assignments of error, the first being that there is no evidence to support the verdict.

Consideration of this assignment, however, requires consideration of some of the other assignments first, because of the opposing constructions of the lease urged by the respective parties. Also, it will not be feasible, and would unduly lengthen this opinion, to discuss each assignment separately and in detail.

The principal controlling point of difference in the opposing theories is that defendant relies upon Section 21, above quoted and Section 17, referred to hereinafter, as exempting them from liability for this accident.

The plaintiff contends that these sections of the lease have no application, and the Court so charged the jury.

Before discussing this question, however, we shall state the evidence favorable to the plaintiff.

Defendants admit that steam coming through the valve caused the damage and the amount of damage is not questioned.

There was evidence as follows:

The valve from which the steam escaped was an ordinary radiator valve designed, and until the removal of the radiator, actually used to control the flow of steam into the radiator.

Prior to the occupancy of the shop by the plaintiff, the radiator to which this valve had been connected was removed.

The pipe which supplied steam to said radiator was left in the shop without being capped, said valve being

the only thing to prevent the flow of steam from said supply pipe.

This supply pipe, being a part of the central heating system of the Robinson Building, was connected to a steam feeder line running to the furnace located in the basement of the Robinson Building.

Steam generated by this furnace, which was located in the basement of the Robinson Building, kept the pipe in the plaintiff's shop constantly filled with steam at all times when the central heating system was in operation.

The lease agreement obligated the defendants to furnish heat to the plaintiff's shop, and the defendants were also obligated to furnish heat for the other shops and offices located in said building.

The furnace in the basement and the pipes and radiators connected thereto, including the valve and pipe from which the steam escaped, constituted the mechanism by which the defendants fulfilled their obligation to furnish heat to the tenants in the building.

The thermostat by which was controlled the flow of steam into the entire heating system was located in the part of the building over which defendants exercised exclusive control.

The valve from which the steam escaped, being connected to the central heating system, could not be removed without "killing" the steam in the entire heating system.

Defendants recognized their control over the radiators in the leased premises by directing the person making the annual inspection of said system to inspect said radiators.

The valve from which said steam escaped was in fact defective, and despite all efforts to keep it closed, had opened from time to time enough to permit the escape of steam during the occupancy of the premises by a former tenant, and defendants were notified of said defective condition by said prior tenant.

The prior tenant actually sustained damage to his merchandise on one occasion by steam escaping from said valve, and the defendants were notified of said defect and promised to remove the entire pipe.

The defendants themselves removed the radiator and left said pipe uncapped with only the valve to control the flow of steam and, notwithstanding the fact that notice was given to them by the prior tenant, did nothing to correct the situation.

The janitor regularly employed by the defendants actually removed the radiator, and one of the defendants witnessed said removal.

The valve remained in its same defective condition at the time that the premises were vacated by the prior tenants, approximately one month before the premises were leased to the plaintiff.

Although the plaintiff leased the premises in the middle of the summer when the heating system was not in operation, the defendants did not warn her or advise her of the defect in said valve and said nothing whatsoever to plaintiff about the same.

The plaintiff at the time of renting the premises did not notice anything to cause her to believe that the valve was defective.

Plaintiff first learned of the defective valve from information given her by the prior tenant about two weeks before the damage occurred.

Upon obtaining said information, the plaintiff immediately notified the defendants, and John Robinson, one of the defendants, promised to fix the valve.

Monte Robinson (P. M. Robinson), one of the defendants, also promised to have said valve fixed.

Thomas Robinson, one of the defendants, promised to fix the valve a Saturday afternoon before the damage occurred.

Defendants never suggested at any time prior to the damage that plaintiff should repair the valve.

The morning after the damage occurred, the defendant P. M. Robinson admitted that the damage was the result of the defendants' negligence.

The promise to repair the valve were not complied with until Tuesday evening after the damage had occurred on the preceding Sunday, at which time the defendants had the valve removed and placed a cap on the pipe.

During the two weeks' period between the time the plaintiff notified the defendants of the defect and the time the damage occurred, no steam escaped from said valve, except for a negligible amount of vapor, which sometimes seeped through when the valve was loose.

Each night before leaving the shop, plaintiff checked the valve to see that it was tightened as much as possible, and at the time that she left her shop around 6:00 P. M. Saturday, March 6th, the valve was tightly closed and no steam was escaping from it.

The valve from which the steam escaped was in fact defective and from time to time worked itself loose enough to permit escape of a small amount of vapor, despite all efforts to keep it closed.

The valve of which the defendants took possession at the time of its removal was not produced at the trial.

Defendants' witness who testified that he removed the valve and who testified as to its condition was not in fact the man who removed the valve.

As to stipulations for exemption from liability in leases.

In 32 Am. Jur. 615, Section 739, it is said: "It seems generally agreed that the landlord may by a stipulation to that effect in the lease or by other agreement with his tenant lawfully relieve himself from any responsibility for damages caused by any vice or defect in the leased property. It is not against public policy for the landlord to contract for an exemption from liability for injury to person or property from leakage, bursting of water pipes, or other damage by water, whether due to the landlord's negligence or that of his agents or employees, or to stipulate who, as between himself and his tenant shall bear a loss arising from non-repair or misrepair of the demised premises; these are not matters of public concern. . ." State ex rel. Bond & Goodwin & Tucker v. Superior Court, 289 U. S. 361, 53 S. Ct. 624, 77 L. Ed. 1256, 89 A.L.R. 654, 175 A.L.R. 89.

Such is the rule in Tennessee in negligence cases where the duty imposed is not a public one, such as that imposed on common carriers. Cincinnati, N. O. & T. P. Ry. Co. v. Saulsbury, 115 Tenn. 402, 90 S. W. 624; Carolina, C. & O. Ry. Co. v. Unaka Springs Lumber Co., 130 Tenn. 354, 170 S. W. 591.

We think the foregoing statements, however, are applicable only where the failure of the landlord to disclose defects is an act of negligence, but not where it amounts to fraud and the action is brought on that theory.

The conduct of the landlord may be such as to amount to negligence only, or it may be both fraud and negligence. 1 Tiffany on Landlord & Tenant, 585, Section 86; 32 Am. Jur. 544, Section 675; Cowen v. Sunderland, 145 Mass. 363, 14 N. E. 117; Willcox v. Hines, 100 Tenn. 524, 45 S. W. 781; Id., 100 Tenn. 538, 546, 46 S. W. 297, 41 L.R.A. 278. Although the opinion seems to be rested on negligence, the delictum, or wrong arising out of the breach of duty to so use your own as not to injure another.

■ We think citation of authority is unnecessary for the statement that one may not contract against liability for fraud.

In the present suit, however, we are of opinion that the evidence could not justify a finding of fraud, but simply of negligence, and the suit is based on the latter theory.

We hold, therefore, that the contract for exemption from liability for negligence is valid.

It is said in argument, and the above cited authorities so state, that such agreements are to be construed strictly. 32 Am. Jur. 615, Section 739.

■ While many of the cases found in the books seem to go beyond the limit of reasonable construction, we think a court should not deliberately emasculate a contract. The better approach is to attempt to arrive at the real intention of the parties in the light of the language used and in view of the subject matter and circumstances of the execution of the contract. Tennessee has long ago adopted this approach and all rules of technical construction of instruments must yield to the intention of the parties.

In Memphis & Charleston R.R. Co. v. Jones, 39 Tenn. 517, the contract for the hiring of slaves provided: "And

all risks incurred, or liability to accidents, while in said service, is compensated for and covered by the pay agreed upon; the said railroad company assuming no responsibility for damages from accident, or any cause whatever.'' Held, railroad not exempt from liability for wilful and gross negligence in running over a slave who was asleep on the track in plain view for a long distance ahead of the train. The court construed it according to the obvious intention and understanding of the parties.

And so in Dodge v. Nashville, C. & St. L. Ry., 142 Tenn. 20, 215 S. W. 274, 7 A. L. R. 1229, the baggage check case with the limitation of liability printed on the back and no notice on the face or otherwise, where it was held, not binding. The customer had no reason to consider it anything more than an identification check.

In Carolina Ry. Co. v. Unaka Spring Lumber Co., 130 Tenn. 354, 170 S. W. 591, 597, supra, it was contended that the stipulation exempted the railroad from fires set by locomotives on the main track as well as on the plaintiff's spur track.

Our Court said: ''We think that, under a fair construction of the language used,'' the exemption was confined to fires emanating from locomotives, etc. on the spur track—the subject of the contract.

Now, looking at the lease before us it is a printed form patently designed primarily for lease contracts covering an exclusive demise of an entire building, but adapted by the lessor to the demise of space in part of a building with a central heating plant and necessarily other machinery, stairways, etc. common to the use of several tenants, control of which is reserved by law to the occupancy and control of the landlord.

Defendants rely particularly on Sections 17 and 21.

Section 17, which has not been quoted above, reads as follows: "Damages, Accidents, Etc. To hold Lessor harmless against all damages, accidents, and injuries to persons or property caused by or resulting from, or in connection with any power plant, machinery, elevator, elevator shaft, stairway, signs, awnings, glass, brick, and other building material, hatch, coal chute or other openings, flag pole, and any other things in or pertaining *to any others part of said building or buildings or things in or pertaining to or upon the buildings or premises during the term of this lease or while the Lessee is occupying the premises.*"

Referring back to Section 21 quoted heretofore, as well as to Section 17, it seems obvious that the real intention of the parties was to contract for exemption of the landlord only as to the *particular space* to be occupied by lessee along with such accessories, machinery and fixtures as were to be used by him *and be under his control.*

Construed otherwise would make the tenant hold the landlord harmless for the major portion of the building and machinery retained by the landlord.

Especially is it true that the valve and pipe, from which the radiator had been removed were of no earthly benefit to the tenant, but was an obstruction to the use of the small space leased to her. One radiator seemed to have been all that was desired for such a small space, so that she had no use for and no intention to use the other pipe connection and valve.

In either case, however, the pipes were directly connected to the central heating system located in the basement, so that the plaintiff would have had to get the landlord to empty the entire heating system of steam before the valve could have been replaced by a cap on the

end of the pipe, or any other disconnection undertaken with reference to this pipe or the other one to which the single radiator was attached.

We recognize the fact that the landlord may by stipulation exempt himself from liability for defects in portions of the property and appliances over which he by contract or by law reserves control, as in Cincinnati, N. O. & T.P. Ry. Co. v. Saulsbury, 115 Tenn. 402, 90 S. W. 624; Carolina Ry. Co. v. Unaka Spring Lumber Co., 130 Tenn. 354, 358, 170 S. W. 591; Cannon v. Bresch, 307 Pa. 31, 160 A. 595; 175 A.L.R. 83; Life & Casualty Ins. Co. v. Porterfield, 239 Ala. 148, 194 So. 173; King v. Smith, 47 Ga. App. 360, 170 S. E. 546; Griffiths v. Henry Broderick Inc., 27 Wash. (2d) 901, 182 P. (2d) 18, 175 A. L. R. 1; Fera v. Child, 115 Mass. 32; 52 C. J. S. Landlord and Tenant, P. 92, Sec. 423.

Yet, we think the landlord has not done so here.

The rule in Tennessee and generally in the absence of stipulation to the contrary is succinctly stated in Wilcox v. Hines, supra, ''that the liability of the landlord ordinarily ceases if he rents out the entire premises, but, when he retains part, it continues so long as he is in possession of such part used for common purposes.'' [100 Tenn. 538, 46 S. W. 302].

Also, Woods v. Forest Hill Cemetery, 183 Tenn. 413, 192 S. W. (2d) 987; Moe v. Sprankle, Tenn. App., 221 S. W. (2d) 712; Lang v. Henderson, 147 Tex. 353, 215 S. W. (2d) 585 (defective gas water heater).

Of course, any tenant may be said to have control to the extent that he may turn on or off the heat by turning on the valve at the radiator. But the active, potent agency is the steam and that is in the control of the landlord and fills the pipe down to the radiator valve whether the radiator be on or off.

■ We are of opinion, therefore, that the defendants remained in control of the valve causing the damage, that said stipulations did not exempt him from responsibility for ordinary care with respect thereto, and that the Court correctly charged the jury to disregard the stipulations.

One of the wrongful acts charged in the declaration is that the defendants knowingly rented the premises in a defective condition to plaintiff.

The general rule over the United States is stated in 32 Am. Jur. 538, Section 671, as follows: ''As indicated in the preceding sections, in the absence of warranty, deceit, or fraud on the part of the landlord, the rule of caveat emptor applies to leases of real estate, the control of which passes to the tenant, and it is the duty of the tenant to make examination of the demised premises to determine their safety and adaptability to the purposes for which they are hired. Hence, for personal injuries received by him from latent defects therein, of which the landlord had no knowledge at the time of the lease, the latter cannot be held responsible. Also a landlord is under no duty to advise a tenant of conditions which are apparent. If, however, the landlord is at the time of the letting aware of the dangerous or unhealthful condition of the premises arising from latent defects, it is his duty to disclose such fact, and his failure to do so or his concealment thereof may constitute fraud or negligence which not only renders him liable to the tenant for resulting injuries, but also enables the tenant to escape liability for future rents if he abandons the possession. So a landlord may be liable for not disclosing a latent source of danger, known by him to be such, and not discoverable by the tenant. The duty of *disclosure arises*

*not directly from the contract, but from the relation* of the parties, and is imposed by law. When the lessor knows of latent defects which are attended with danger to an occupant and which a careful examination would not disclose, the lessor is bound to reveal them, in order that the lessee may guard against them. While the failure to reveal such facts may not be actual fraud or misrepresentation, it is such negligence as may lay the foundation of an action against the lessor if injury occurs; and the liability of the landlord is similar to that of a person who delivers an article which he knows to be dangerous to another ignorant of its qualities, without notice of its nature or qualities. . . ."

Numerous cases in support of this rule are cited, including Willcox v. Hines, 100 Tenn. 538, 46 S. W. 297.

In that case the court in making the distinction between the relationship between the parties arising out of the contract and, on the other hand, arising by law, said: "The ground of liability upon the part of a landlord when he demises dangerous property has nothing special to do with the relation of landlord and tenant. It is the ordinary case of liability for personal misfeasance, which runs through all the relations of individuals to each other."

The opinion goes one step further and, affirming the prior decisions in Hines v. Willcox, 96 Tenn. at pages 148 and 163 and 328, 33 S. W. 914, 34 L. R. A. 824, 832, lays down the rule in Tennessee that the landlord is responsible for latent defects not only such as are actually known to him but also such as he should have *discovered by the exercise of ordinary care,* unless of course, the tenant was himself guilty of failure to use ordinary care; but pointing out that, while the degree of care required of

each is the same, the circumstances may be, and usually are, not the same, because of the landlord's greater familiarity with the property.

It is argued, however, that plaintiff was guilty of contributory negligence (1) in that the valve and pipe were as apparent to her as they were to the landlord and (2) in that she continued to expose her property to the danger for almost two weeks after she became aware of it.

As to (1), she was unfamiliar with the premises, saw it only twice a few days before executing the lease, the heating plant was free of steam, it being during July, and the defect would show up only under the pressure of steam. This could not be negligence as a matter of law.

As to (2) we have already held that the landlord was under the duty to repair. Therefore, the promise of the landlord to repair was not without consideration. It was a recognition of an existing obligation and is supported by the consideration for the original lease contract. Haynes v. Morton, Tenn. App., 222 S. W. (2d) 389, 393.

The tenant is entitled to rely upon such promises for a reasonable length of time, except of course in the face of imminent and serious danger, and what is reasonable is ordinarily for the jury. Gray v. Spitler, 10 Tenn. App. 34; Solvent Savings Bank v. Vance, Tenn. Civ. App., 7 Higgins 383; Lang v. Henderson, supra.

We are of opinion that plaintiff was not guilty of contributory negligence as a matter of law.

It is said that plaintiff could have made the repairs herself at a nominal cost and hence her damages are limited to such cost.

That rule has no application where the landlord prevents the tenant from doing so, as by repeated promises, which are relied on in good faith by the tenant. Such

is the evidence here and the question was for the jury. Parker v. Meadows, 86 Tenn. 181, 6 S. W. 49.

By Assignment VIII it is said there is no evidence that defendants knew no person would be in the plaintiff's store on Sunday to turn off the valve when the heat was turned on. That it was error to charge the jury in respect to this part of plaintiff's theory.

Suffice it to say that according to common knowledge and custom no person would be expected to be in a small shop 8 x 16 early Sunday morning, unless they were known to sleep there customarily.

Assignment IX overlooks the plaintiff's theory supported by evidence that the valve was defective and tended to leak unless repeatedly tightened.

The same may be said of Assignment X.

Assignment XI complains of admission of plaintiff's testimony that subsequent to the accident the defendant's janitor delivered her an additional key.

It is said this was prejudicial because it left the impression that the janitor or some other employee had entered at night and tampered with the valve, whereas it was undisputed that none of defendants' employees was authorized to have a key.

Since the case was tried on the theory that the valve was defective, and not that someone turned it on, it should hardly have been prejudicial.

We believe the foregoing disposes adversely of all assignments of error and same are overruled. We think the charge of the Court was clear, correct and complete.

The judgment below is affirmed and judgment will be entered here for $1700 with interest from March 18, 1949 and costs.

Anderson, P. J., and Baptist, J., concur.