**Robert R. GOFFE, et al., Appellants,**

v.

**John G. PICKARD, et al., Appellees.**

**No. 89–846.**

District of Columbia Court of Appeals.

Argued Nov. 20, 1990.

Decided March 26, 1991.

**266**

Raymond B. Benzinger, for appellants.

William H. Jeffress, Jr., for appellees.

Before ROGERS, Chief Judge, and FERREN and FARRELL, Associate Judges.

FARRELL, Associate Judge:

In this appeal from judgment following a bench trial, we sustain the trial judge's determination that appellants, as landlord, are liable for the cost of rectifying a leakage of water that originates on property under appellants' control. We also uphold the judge's award of attorney's fees to appellees under the exception to the American Rule for bad faith litigation.

**I.**

In the spring of 1986, appellee John G. Pickard was looking for a townhouse to purchase as an office for his urban planning and design business. Through his real estate agent, Pickard learned that a townhouse located at 3244 Jones Court, near Wisconsin Avenue in Georgetown, was for sale. The house, advertised at a price of $215,000.00, was jointly owned by appellant Robert Goffe and two others, and was one of a group of ten townhouses built off a shared courtyard. Five of the houses, including the one owned by Goffe and one owned by Arnold Kuperstein, have private patios in the rear; beneath these patios are five garages which open into an alley running alongside the Goffe townhouse and occupy the land owned by Goffe and Kuperstein. The real estate listing noted that garage parking was available and instructed interested parties to "inquire of lister." In response to the listing, Mr. and Mrs. Pickard made a written offer to buy the Jones Court townhouse for $210,000.00. This sum was for the townhouse and "garage 3 conveyed by easement." Robert Goffe and the co-owners accepted the reduction in price proposed by the Pickards, but amended the garage clause to read: "garage 4 or 5 at the purchasers' option conveyed by easement or leasehold. Garage to convey in 'as is' condition." The Pickards agreed to this change and, after inspecting garages four and five, chose garage number five, which is directly below all of the private patio of the townhouse owned by Kuperstein and half of the patio of the townhouse owned by Goffe.

Settlement took place on September 12, 1986. At that time, the Pickards received a lease agreement signed by Robert R. Goffe, Julie H. Goffe, and William D. Goffe as landlord, leasing garage number five to John Pickard and D. Patricia Pickard for ninety-nine years. The Pickards sought and obtained various modifications in the lease; one was the addition of language allowing the garage to be used as a "storage area for professional or residential related items." The lease provided that "Tenant agrees to take the Premises in 'as is' condition."

As the trial judge found, when Mr. Pickard examined the garage with his real estate agent before settlement, he "saw no evidence of serious leaks through the roof of the garage." Not until a heavy rainstorm some weeks after settlement did Pickard discover that the garage had a significant leakage problem. Following the storm, Pickard found a large quantity of water leaking into the garage from the roof. The floor of the garage had flooded, preventing use of the garage as a reliable storage space for professional or personal

materials, as provided for in the lease. Moreover, as the judge noted, the water draining into the Pickard garage was corrosive.

In his findings of fact, the judge credited Mr. Pickard's explanation of the source of the water seepage problem, finding that "the leak was attributable to the construction of the patios of the townhouses owned by Mr. Goffe and [Mr.] Kuperstein." The Kuperstein and Goffe private patio areas, each uncovered and exposed to the elements, together form the roof of garage number five. The ceiling of the garage is composed of concrete panels, each approximately four feet wide and running horizontally from one side of the garage to the other. Rain collects on the patios during either moderate or severe storms and seeps through the mortar that joins the bricks, through gaps in the garage's concrete slab ceiling, and into the garage underneath. The rainwater combines chemically with components in the concrete, making the water that leaks into the garage corrosive. To protect any cars using the garage from these deposits, Pickard built a kind of "awning" of plastic sheeting hung from a wooden frame erected just below the garage's ceiling. The measure was only a temporary solution, however, because the sediment deposited by the leaking water damaged the plastic, requiring it to be replaced periodically. Also, to install the awning Pickard had to remove the garage door, which kept the garage from being secured and made it unsuitable for use as a storage space.

Pickard notified Robert Goffe in writing on October 23, 1986 that the garage leaked, leaving sediment on any cars parked in the garage, and asked that they meet to discuss correcting the situation. Goffe did not reply to this letter, but in the late fall of 1986 the two men met unexpectedly in the courtyard of the townhouses at Jones Court, at which time, as the trial judge found, Robert Goffe disclaimed responsibility for the problem. On February 6, 1987, some time after this encounter, Pickard wrote a second letter to Goffe asking that he repair both the Goffe and Kuperstein patios as a permanent remedy for the leaks. In this letter, Pickard also expressed his understanding that the owner of 3250 Jones Court, Kuperstein, had granted Goffe an easement over the Kuperstein patio. Goffe responded in a letter dated February 10, 1987, rejecting Pickard's contention that Goffe had any responsibility for fixing the garage roof, and stating that Pickard was free to "take whatever steps necessary to alleviate your problem as long as it does not disturb my property or lessen its value." In his February 16, 1987 answer to Goffe, Pickard explained that the leaks could not be stopped without a significant intrusion upon both the Goffe and Kuperstein properties to make the repairs. Pickard emphasized that because half of the garage was below the Kuperstein patio, entering the Kuperstein property was essential to completion of the needed repairs, and Goffe's easement agreement entitled Goffe alone to a right of access to the Kuperstein patio.

Pickard, who had never seen the purported easement agreement between Kuperstein and Goffe, became concerned about a possible cloud on his leasehold interest in the garage. His concern proved to be well-founded. The Goffe and Kuperstein townhouses shared the same lot. As the trial judge found, at the time the two owners purchased their townhouses, they had agreed to subdivide the lot to give them separate ownership of their properties. The proposed agreement called for sole ownership by Kuperstein of garage number one, and sole ownership by the Goffes of garages two through five. When the subdivision agreement proved impossible to effectuate, however, the parties drafted and submitted to each other counter-proposals to carry out the intent of the agreement by reciprocal leases or easements. Pickard searched the public record for the existence of an easement and found that, while the original subdivision agreement between Kuperstein and Goffe was recorded, no lease or easement implementing the agreement had ever been filed. He met with Kuperstein and was told that the latter had not executed a set of reciprocal leases Goffe had prepared in the fall of

1983 that would have allowed Goffe to lease garage number two to a tenant. Instead Kuperstein had sent Goffe a proposed easement agreement in May 1984 obligating Goffe to pay a share of Kuperstein's property taxes on the 3250 Jones Court townhouse, apparently in consideration for Goffe's effective ownership of four of the five garages. Goffe did not respond to receipt of this document, and as a result, according to Kuperstein, "no such [easement] agreement exists."

Concerned about this threat to their 99-year lease, the Pickards engaged counsel who wrote Robert Goffe requesting a copy of any easement agreement between Goffe and Kuperstein. In reply, Goffe asserted that the Pickards had been given a copy of the easement agreement allowing Goffe to lease garage number five "well before the closing." The trial judge found, however, that the Pickards had not been given any such easement before or after closing. Further correspondence between the Pickards' attorney and Goffe yielded no evidence of Goffe's right to lease Kuperstein's property, nor any willingness by Goffe to resolve the problem of title or the leakage problem informally. The Pickards brought suit on July 29, 1987, seeking good leasehold title to the garage through specific performance and correction of the water leakage problem, as well as other relief not here relevant.

Of key importance to the trial judge's ultimate decision to award attorney's fees is the judge's finding that after the Pickards' suit had commenced, Robert Goffe, responding to a document request, "produced a copy of the easement agreement proposed to him by Kuperstein in May 1984, reflecting the signatures of the Goffes notarized in October 1984." In the copy of the agreement provided by Goffe, the language requiring Goffe to pay a share of Kuperstein's property tax had been stricken. These alterations were accompanied by the initials "ANK"—purportedly placed there by Kuperstein—along with the initials of the Goffes. Robert Goffe never produced the original of this document, but testified both that the document was authentic and that his legal right to lease the garage to the Pickards stemmed in part from the agreement it embodied. Kuperstein testified, by contrast, that the initials represented as his and the changes alongside those initials had been forged, that in fact Kuperstein had never received the original easement agreement back from Goffe, and that he had not known that the Goffes had signed the easement agreement until he was shown the copy that had been given to the Pickards' attorney. Kuperstein also refuted Robert Goffe's assertion that Goffe had sent him a letter on August 7, 1987, confirming the existence of an easement agreement. As the trial judge noted, Goffe not only had not produced the August 7, 1987 letter in response to the Pickards' February 1988 document request,[1] but he also testified at his deposition that he believed that other than the easement agreement itself, there had been no written communications between himself and Kuperstein regarding the easement.

An easement agreement was finally executed by Kuperstein and the Goffes on March 16, 1989, four days before the trial began. The trial judge ruled that execution of this agreement rendered the Pickards' demand for specific performance of the garage lease agreement moot on the issue of title.[2] The judge found, however, "that at his deposition [and in response to the document request], Robert Goffe knowingly presented a false document to support his defense in this lawsuit," that the defense "was vexatious and designed to avoid responsibility to the plaintiffs in bad faith," and that therefore Goffe was re-

---

1. That request asked for, among other things, "copies of all correspondence between Robert Goffe and Kuperstein relating to garages from date of purchase to the Present."

2. The judge concluded that this agreement represented "a valid conveyance by Kuperstein to the Goffes of Kuperstein's interest in garage 5, and accordingly, the [Pickards'] lease from [the] Goffes now grants them valid, merchantable 99-year leasehold title to garage 5 for which they bargained and paid in 1986."

sponsible "for the plaintiffs['] costs and attorneys['] fees incurred in prosecution of the lawsuit up to March 16, 1989," when the genuine easement agreement was completed.[3] The judge concluded, therefore, that Robert Goffe, along with Julie Goffe and William Goffe, were liable for $6200 in damages—and would be required to allow the Pickards entry onto the Goffe and Kuperstein patios to make the needed repairs—unless the Goffes themselves corrected the garage's leakage problem within sixty days.[4] The court further ruled that Robert Goffe alone was responsible for the $12,000 in attorney's fees and costs which the court awarded to the Pickards.

### II.

The first issue we address is whether the trial judge correctly ruled that the Goffes were liable for the damages incurred by the Pickards as a result of the water seepage through the garage roof. Appellants' principal argument, and the only one requiring discussion, is that the "as is" clause in the contract and lease shifted responsibility for any such damages to the tenants.[5]

■ The general rule is that a landlord who retains exclusive control of a portion of the building in which the leased premises exist

> is bound to use reasonable and ordinary care in managing the part over which he retains control.... A landlord is liable for injuries to the property of a tenant

because of the defective condition of that property remaining under the landlord's exclusive control, which he negligently fails to correct.

*Franklin Drug Stores, Inc. v. Gur–Sil Corp.*, 269 N.C. 169, 173, 152 S.E.2d 77, 79 (1967). *See Karl W. Corby Co. v. Zimmer*, 99 A.2d 485 (D.C.1953); *Freidenburg & Co. v. Jones*, 63 Ga. 612 (1879); *Levine v. Baldwin*, 87 A.D. 150, 84 N.Y.S. 92 (1903); *Steffan v. Meiselman*, 223 N.C. 154, 25 S.E.2d 626 (1943); *Robinson v. Tate*, 34 Tenn.App. 215, 236 S.W.2d 445 (1950); RESTATEMENT (SECOND) PROPERTY, LANDLORD AND TENANT § 17.3 (1977) (parts of leased property retained in landlord's control which tenant is entitled to use, such as common hall, elevator, bathroom); *id.* § 17.4 (parts of leased property retained in landlord's control necessary to safe use of part leased, such as walls, roof, foundation). As this court's predecessor stated, "The test ... for fixing the landlord's liability is one of control." *Karl W. Corby Co. v. Zimmer, supra*, 99 A.2d at 487.[6]

■ Appellants do not dispute these principles but argue that the "as is" clause in the contract and lease relieved them of liability for leakage into the garage. It is unnecessary for us to consider the validity of such clauses in the landlord and tenant context generally. We may assume, without deciding, that under some circumstances the law permits a landlord to contract away liability for damage to a tenant's property resulting from defects in the portion of the premises retained by the

---

3. At the same time, the judge found that neither Julie Goffe nor William Goffe had known the easement agreement was forged or that Robert Goffe's testimony about the agreement was false.

4. The judge rejected appellants' claim "that the plaintiffs knew of the defect in the patio above the garage of leakage into garage 5 at the time of their lease."

5. We find no basis for disturbing the judge's finding that the Pickards did not know of the defect in the patio above the garage at the time they entered into the lease. The court specifically found that an inspection by the Pickards and their real estate agent failed to reveal evidence of serious leaks.

6. The source of the landlord's obligation to maintain portions of a rented building under its control is found not in contract theory, but rather in the tort doctrine *sic utere tuo ut alienum non laedas,* that is, one should not use one's property to injure another. M. FRIEDMAN, LEASES § 10.104 (1983); *see Gill Bldg. Co. v. Central Garage Co.,* 258 Wis. 76, 81, 44 N.W.2d 905, 908 (1950) (landlord's duty to use reasonable care to keep portions of building reserved for landlord use in repair arises in law of negligence); *see also Franklin Drug Stores, Inc., supra,* 152 S.E.2d at 80 (fact that injury to property is suffered by tenant does not eliminate a landlord's liability for negligence).

landlord.[7] The cases make clear, however, that clauses purporting to do so are read strictly and will not be construed to eliminate landlord liability for negligence if the language of the lease does not make that aim clear. *Daltex, Inc. v. Western Oil & Fuel Co.*, 275 Minn. 509, 517, 148 N.W.2d 377, 384 (1967). *See Meyer Jewelry Co. v. Professional Bldg. Co.*, 307 S.W.2d 517, 521 (Mo.App.Ct.1957); *Randolph v. Feist*, 23 Misc. 650, 651, 52 N.Y.S. 109, 110 (1898). The focus of the inquiry must be on the intent of the parties: did they intend the landlord's exemption to encompass damage resulting from defects in property *outside* the leased premises?

The Court of Appeals of Tennessee addressed this question in a case involving an "as is" clause (as well as two other clauses limiting landlord liability) in a lease for a space used as a clothing shop on the ground floor of a building. In *Robinson v. Tate, supra*, steam from a defective radiator valve on a heating pipe escaped into a clothing store, damaging the tenant's property. The radiator to which the pipe had been attached had been removed by the landlord sometime before the tenant took possession of the shop. The lease obligated the landlord to provide heat to the clothing shop as well as to the other tenants in the building, and the thermostat was located in a part of the building under the landlord's control. The landlord claimed exemption from liability under the exculpatory clauses in the lease. The court of appeals began by recognizing that its task was "to attempt to arrive at the real intention of the parties in the light of the language used and in view of the subject matter and circumstances of the execution of the contract." 236 S.W.2d at 450. The court looked at the lease's exculpatory language and concluded:

> [I]t seems obvious that the real intention of the parties was to contract for exemption of the landlord only as to the *partic-*

*ular space* to be occupied by lessee along with such accessories, machinery and fixtures as were to be used by him and *be under his control.*

> Construed otherwise [the clause] would make the tenant hold the landlord harmless for the major portion of the building and machinery retained by the landlord.

*Id.*, 236 S.W.2d at 451 (emphasis in original).

In a case also involving an "as is" clause (and another exculpatory clause) in a lease, the Supreme Court of Minnesota performed a similar analysis and reached the same conclusion:

> Viewing the language of these provisions as a whole, and noting their reference only to the condition of the leased premises and defects or changes of condition therein, it is obvious that in exempting the lessor from liability for damage to the premises, *the parties contemplated damage from defects or conditions in the leased premises, and not damage from defendant's negligence committed outside the leased premises,* upon and regarding property over which the defendant had exclusive control.

*Daltex, Inc. v. Western Oil & Fuel Co., supra*, 148 N.W.2d at 384 (emphasis added).

In the present case, the trial judge looked similarly to the "as is" language in the sales contract and lease and concluded that it was meant "to exclude warranties by the seller as to defects in the garage itself," whereas the defect in issue was "not in the garage itself but in the patios of the Goffes and Kuperstein, which are constructed in ... a fashion that permits water and corrosive substances to enter the garage through the roof."[8] The lease as a whole confirms this interpretation. Paragraph 25 provides that the tenant will hold the landlord harmless for claims arising

---

7. *Compare, e.g., Robinson v. Tate,* 236 S.W.2d at 451 *with* RESTATEMENT, *supra*, § 17.3, comment j; § 17.6 comment d (precluding/limiting exoneration clauses purporting to exempt landlords from duties created by statute or regulation or from an implied warranty of habitability).

8. The judge specifically credited the Pickards' testimony that the reason for the leakage was that the bricks comprising the patio had not been sealed properly when the patio was constructed.

out of injury to persons or damage to the tenant's property caused by any defect in the "Premises." The term "Premises" as used in the lease refers to the space leased to the Pickards; the term "Building" is separately defined as "the building of which [the Premises] form a part." Where the lease provides obligations regarding the Building, as opposed to or in addition to the Premises, it specifically so states. We find no indication in the language of the lease, or in the circumstances surrounding its execution, that the parties intended the exemption to extend to damage resulting from defects in the part of the premises remaining under the Goffes' control.

The cases relied on above teach that without clear reference in "as is" language to the property retained by the landlord, a court should not extend the reach of such language beyond the boundaries of the leased premises. Because the patio causing the leakage is outside the portion of the structure leased to the Pickards, we hold that the "as is" clause did not relieve the Goffes of liability for the damage caused to the Pickards' right of enjoyment.

### III.

█ Appellants further challenge the award of attorney's fees and costs to the Pickards. The judge awarded the fees after finding that Robert Goffe "knowingly presented a false document to support his defense in the lawsuit," and that this conduct "was vexatious and designed to avoid responsibility to the plaintiffs in bad faith." Appellants correctly note that the "bad faith" exception to the American Rule is reserved for extraordinary cases, *Launay v. Launay, Inc.*, 497 A.2d 443, 450 (D.C. 1985), and that "a party alleging that an action has been ... litigated in bad faith" bears a "heavy burden" of proof. *Schlank v. Williams*, 572 A.2d 101, 111 (D.C.1990). But an appellate court's role in this determination is limited: "the predicate finding

of bad faith *vel non* is a factual one which we review under the clearly erroneous standard," *id.*, and the decision to award fees will be reversed only for abuse of discretion. *Trilon Plaza Co. v. Allstate Leasing Corp.*, 399 A.2d 34, 38 (D.C.1979). The trial judge's finding that Robert Goffe knew the 1984 easement agreement purportedly initialed by Kuperstein was a false document rested upon an evaluation of the credibility of witnesses, and we will not disturb it. The conclusion that Goffe relied on the document to force the Pickards to incur litigation expenses until the eve of trial when a genuine easement agreement mooted the issue of title is also supported by the record and must be sustained.

█ "Bad faith attorneys' fees are limited to payment for work and expense attributable to the guilty party's bad faith endeavors." *Synanon Foundation v. Bernstein*, 517 A.2d 28, 38 (D.C.1986). The judge awarded the Pickards the $8000 they had been forced to pay their attorneys until the March 1989 agreement was concluded.[9] He also awarded them $4000 for costs in connection with depositions, transcript preparation, delivery of documents, and the supplies they had purchased to erect the protective awning in the garage. Appellants argue that the judge failed to assess the reasonableness of the attorney's fees using the "lodestar" formula of hours expended multiplied by a reasonable hourly fee (plus any adjustment). *See, e.g., District of Columbia v. Jerry M.*, 580 A.2d 1270, 1280-82 (D.C.1990); *General Fed'n of Women's Clubs v. Iron Gate*, 537 A.2d 1123, 1130 (D.C.1988) (formula applied to fees awarded under bad faith exception). Appellants, however, never challenged in the trial court the reasonableness of the rates charged or the number of hours expended by the Pickards' attorneys; nor do they contend they were denied the opportunity to mount such a challenge. Their present attack thus comes too late.[10] In

---

9. The Pickards' contingency arrangement with their attorneys provided that they would pay a maximum of $8000 out of pocket and that any additional fees would come from a favorable settlement or judgment. The $8000 in fees had been billed and paid before trial.

10. Nor can there be doubt that the Pickards were a "successful party" in the litigation, *F.D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974), since—as the trial judge implicitly found—their prosecution of the lawsuit caused Goffe finally to obtain a genuine easement agreement with Kuperstein on the eve of trial.

*Synanon* we stressed that there must be "a nexus between the ... bad faith litigation manoeuvres ... and the attorneys' fees awarded," 517 A.2d at 38, and in this case the judge found that nexus in Robert Goffe's knowing reliance on a false document to present a defense to the good title aspect of the suit that "was vexatious and designed to avoid responsibility to the plaintiffs in bad faith." There is no basis in the record for disputing the amount of the attorney's fees awarded.

■ On the other hand, the award of even a nominal sum—as appears to be the case here—for the Pickards' expenses in erecting the protective awning in the garage cannot be justified under a rule shifting the costs of *litigation* because of bad faith. We therefore must remand the case to the trial court for deletion of that sum from the award.[11] In all other respects,[12] the judgment of the Superior Court is

*Affirmed.*

---

11. Because the amount involved is nominal, we *suggest* the parties could resolve this issue by filing a precipe with the court acknowledging the amount to be credited against the fee award.

12. We reject appellant's remaining contentions, including the claim of breach of the lease agreement by the Pickards.