In re Mark B. SANDGROUND, Respondent,

A Member of the Bar of the District of Columbia Court of Appeals.

No. 86–1699.

District of Columbia Court of Appeals.

Argued Sept. 2, 1987.
Decided May 31, 1988.

John W. Karr, with whom William G. McLain, Washington, D.C., was on the brief, for respondent.

Joan L. Goldfrank, Washington, D.C., for the Board on Professional Responsibility.

1. "A lawyer shall not ... [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

2. "A lawyer shall not ... [e]ngage in conduct that is prejudicial to the administration of justice."

3. "In his representation of a client, a lawyer shall not ... [c]ounsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

Elizabeth J. Branda, Asst. Bar Counsel, with whom Thomas H. Henderson, Bar Counsel, Washington, D.C., was on the brief, for the Office of Bar Counsel.

Before MACK, BELSON and ROGERS, Associate Judges.

PER CURIAM:

In this disciplinary matter, the Hearing Committee found that Mark B. Sandground had violated DR 1–102(A)(4),[1] (5),[2] and DR 7–102(A)(7)[3] by assisting his client in concealing information about the client's funds with respect to discovery requests in a pending divorce suit. The Committee recommended a sanction of public censure. The Board on Professional Responsibility agreed with the findings that these disciplinary rules had been violated, but recommended that Sandground be suspended from the practice of law for ninety days.[4] Before this court Sandground contends that the Board erred in refusing to admit the results of a polygraph examination concerning Sandground's motives for participating in the transaction, and also that the severity of the recommended sanction is inconsistent with "dispositions for comparable conduct or otherwise ... unwarranted." D.C. Bar R. XI, § 7(3). Bar Counsel responds that a nine-month suspension is warranted. We adopt the Board's recommendation.

## I

### *The underlying facts*

In late 1982, Robert L. Powell retained Sandground to represent him in a lawsuit involving Powell's family business. Sandground quickly became Powell's close personal friend and confidant.

4. Three Board members dissented from the six-member majority's sanction recommendation and filed a separate report in which they recommended a nine-month suspension. The Office of Bar Counsel, which had recommended suspension for a year and a day to the Board, argues on appeal that this court should adopt the recommendation of the Board minority.

In January, 1983, Powell moved out of his marital home and into an apartment in Bethesda, Maryland. Powell retained Sandground to represent him in connection with his marital difficulties. On April 14, 1983, Mrs. Powell hired a detective to conduct surveillance of her husband. Powell became aware of this surveillance and was very disturbed by it. Sandground testified that Powell became upset, agitated, and somewhat paranoid; Powell telephoned Sandground about his problem at least twice a day. Mrs. Powell terminated the surveillance after the detective obtained evidence that Powell had shared a hotel room in the Bahamas with another woman on May 1, 1983.

On May 11, 1983, Mrs. Powell, through her attorney George Paxton, filed a complaint for divorce in Montgomery County, Maryland, which requested an order providing spousal support and dividing all marital property. In the complaint, all of the marital property was listed, and values estimated, except for "cash accounts in Husband's name," which was listed as "unknown."

Sandground developed with Powell a proposed settlement agreement to provide spousal support and to divide marital property, and submitted it to Paxton on May 26, 1983. Paxton responded that Mrs. Powell had objected to Powell's failure to disclose his cash assets, and that additional information would be required for a settlement. Paxton also stated that he would send Sandground a set of interrogatories to be answered under oath by Powell.

During the preliminary stages of the divorce proceedings, Powell had become annoyed by his wife's surveillance, and decided to look for a new place to live. He first moved to an apartment on Cheltenham Road, then to another apartment on Glenbrook Road, and then began looking for a permanent place to live. Powell testified, however, that he had told his wife of both locations and that she "always knew where to find me." Powell eventually found a desirable house on Hunt Avenue and a realtor presented him with a proposed contract on June 2, 1983. On Sandground's advice, he did not sign the contract and

Sandground, Powell, and the realtor met in Sandground's office in June, 1983. Sandground informed the realtor that, because of a "messy divorce situation," Sandground would be the purchaser instead of Powell. Sandground then submitted an offer as trustee and gave the realtor a promissory note for $6,800 as a deposit. Powell, in turn, gave Sandground a check for $6,800. Sandground and Powell also completed a letter agreement between themselves, on June 6, 1983, under which Sandground would purchase the property for Powell in a "secret transaction because of the matrimonial situation, and as soon as the divorce is final, the property will be transferred to you and all documents entered into will be destroyed." On June 7, the owner of the Hunt Avenue property accepted another offer; the realtor returned Sandground's deposit and Sandground returned the money to Powell.

Powell had moved back into the family home for a few days in August, 1983, when Mrs. Powell was hospitalized. Mrs. Powell later discovered the June 6 letter agreement among Powell's things and showed the letter to her lawyer. Paxton did nothing about the letter until the divorce case ended; he then forwarded the matter to Bar Counsel. Before the Committee, Powell testified that the purpose of the secret transaction was to conceal his whereabouts from his wife and Sandground testified that Powell was "terribly afraid that his wife would know where he was." Powell did not explain why he believed Sandground's possession of title would conceal his residence from his wife, and Sandground represented that he was merely attempting to assuage Powell's paranoia.

In the meantime, on June 13, 1983, Paxton had sent a set of interrogatories to Sandground. The parties had agreed to use an informal procedure to avoid public disclosure of Powell's financial affairs. Sandground acknowledged that his responsibility to disclose accurate information was "no different than if it had been a formal pleading to be filed in court." On July 20, 1983, Sandground returned an answer in which Powell answered "none" to the question whether there were funds that

had been placed under another person's name *"at any time during your marriage,"* and thereby withheld information concerning the temporary transfer of $6,800. Powell also responded that he had $2,500 in an "IIA" account when he in fact had approximately $12,000 throughout June, July, and August. Paxton objected to this response on the grounds that it was unsigned and unverified and that the answers were sketchy; he stated that he might have to take Powell's deposition. Sandground agreed that a deposition, to be filed with the court, could take place on September 1, 1983. On August 17, Paxton received a second set of answers to the June interrogatories; they were identical to the first set except that Powell had appended a piece of paper containing his unverified signature.

Two days later, on August 19, 1983, Powell gave Sandground a check for $12,000 to be held in trust. Sandground placed the check into an escrow account.

On receiving the August 17 answers, Paxton demanded a verified set of answers. Sandground objected to Paxton's "aggressive attitude." When Paxton held firm to his demand for verified and complete information, Sandground represented on August 23, in a letter urging settlement, that Powell "has fully disclosed all of his assets" and that a set of answers for execution before a notary was being prepared, and affirmed his intent to produce Powell for a deposition. The next day, Sandground deposited Powell's $12,000 check in the bank. He had also advised Powell to reveal the $12,000 at any deposition; he later testified that he did not inform Paxton of the funds because he was busy and because he assumed the information would be conveyed at the deposition.

Sometime after August 23, Powell transferred primary responsibility for his divorce case to a Maryland attorney, Arnold Blank. Blank suggested that Powell should ask Sandground to return the $12,000. Powell made the request, and Sandground returned the money, with interest, on September 20, 1983. Complete, accurate, and verified answers to the interrogatories were furnished through Blank on September 29, 1983, and Powell's deposition was taken on September 30.

### The disciplinary proceedings

When the disciplinary process began, Sandground originally stated in a letter to Bar Counsel, and Powell affirmed in an affidavit, that he had given the $12,000 to Sandground in order to facilitate the purchase of the Hunt Avenue property. These representations were patently implausible, given the dates described above. Before the Hearing Committee, Powell changed his explanation and claimed that the transfer was to facilitate the possible purchase of another house. Sandground agreed with this explanation. The evidence also showed, however, that Powell purchased a home in Germantown, Maryland and that he made a $3,000 deposit on or about August 17, 1983. Necessarily, this money did not come from the $12,000 later held by Sandground.

Based on these facts, the Committee concluded that, with respect to the $12,000 transfer,[5] Sandground "did violate the three disciplinary rules ... in that he did actively and knowingly participate in conduct designed to withhold material information concerning [Powell's] cash holdings from Mrs. [Powell] and her attorney under circumstances where there was a duty to disclose the information."[6] With respect

---

**5.** The Board and the Committee found that the June transactions had evidentiary value but did not constitute a violation in themselves: "The Board agrees with the Hearing Committee's determination that the June transaction, standing alone, is not sufficient to sustain the alleged violations. The main thrust of the charges against Respondent is knowing participation in his client's efforts to submit false information in responses to discovery requests in the divorce case. However, at the time of the June transac-

tion, no discovery request had been served on either Respondent or Powell, and hence Powell had not yet submitted any false information in the divorce case."

**6.** The Committee did not accept in full Bar Counsel's position that there was a preconceived conspiracy to conceal the information, finding only that Sandground "allowed himself to become an active instrument of that concealment."

to Sandground's contention that he assumed the information would come out at Powell's deposition, the Committee wrote:

> Even if this was Respondent's reason at the time for not informing Paxton, it does not explain Respondent's silence after the deposition was postponed for a month [until September 30]. But we cannot credit Respondent's explanation. On August 23 he wrote Paxton (for the last time) assuring him that he sincerely wished "to settle this matter with you now." Respondent had received the $12,000 check four days earlier. The failure to mention this previously undisclosed cash in the August 23 letter does support the inference that Respondent and [Powell] were trying to settle the case without Paxton becoming aware of the full extent of [Powell's] cash holdings.

The Committee recommended a sanction of public censure. The Board agreed with the Committee's findings of fact and stated that Sandground "knowingly participated in his client's efforts to withhold information or to conceal the amount of his client's cash holdings." The Board, however, recommends that Sandground be suspended for three months. On this appeal, Sandground does not challenge the findings of fact, but contends that the Committee's recommended sanction of public censure is appropriate.

## II

■ Sandground first contends that the Board erred in refusing to admit, solely on the question of the appropriate sanction, the results of a polygraph test concerning his motives for taking these steps on behalf of his friend and client. As required by Board Rule 11.10, the Committee held bifurcated hearings on the questions of liability and recommended sanction. The evidentiary record relating to the alleged violations was closed on January 7, 1986, and thereafter, the Hearing Committee issued its tentative decision finding three violations. The Committee then scheduled hearings to receive evidence on the appropriate sanction. April 7, 1986 was fixed as the final date for receiving such evidence. On April 16, 1986, Sandground submitted a report on a polygraph examination that had been administered on April 13, 1986. The Committee gave no weight to this report because of its tardy submission, because it doubted the admissibility of the evidence in any event, and because "our perusal of the record suggests that the answers to the questions asked, even assuming their truthfulness, would not significantly aid the Committee in deciding the liability issues in this case." Sandground nonetheless attached a copy of the polygraph report, with respect to the issue of the appropriate sanction, to a brief submitted to the Board.

The Board refused to consider the report. It concluded that the Committee was correct in giving no weight to the evidence and agreed that Sandground's statements of "innocent purpose," as expressed in the polygraph report, relate to the question whether there was a violation, which had already been adjudicated. The Board adopted the Committee's statement, made at the sanctions hearing, that evidence of intent "belongs, if at all, in the liability phase of the case and not the mitigation level." Sandground contends on appeal that the polygraph statements concern his motives in engaging in these transactions, as opposed to his intent and knowledge. These statements,[7] however, are directly relevant to his knowledge and inconsistent with the Board's finding, which Sandground ostensibly does not challenge on

---

7. Sandground answered the following questions in the negative:

   Did you purposely conceal that twelve thousand dollars belonging to Robert Powell from Harriett Powell or her attorney?
   Did you deliberately place that twelve thousand dollars into that account to keep it from being identified as assets of Robert Powell? Concerning that twelve thousand dollars, did you purposely lie when you stated you specifi-

cally instructed Robert Powell to make full and truthful disclosure in any judicial proceeding?
   When you placed that twelve thousand dollars into that account, did you know for sure Robert Powell was attempting to conceal it?
   The examiner concluded that the polygraph registered truthfulness on each of these responses.

appeal, that he knowingly assisted his client in the concealment of his assets. The polygraph report represented an attempt to relitigate liability, or at least to contradict the express findings of the Committee, and was therefore properly not considered by the Board.

### III

Sandground next contends that, even if the polygraph report is inadmissible, the Board's recommended three-month suspension is unwarranted. He cites his unblemished record after thirty years of practice, his excellent professional reputation,[8] and contends that the purposes of disciplinary action would be fully served by public censure. *See District of Columbia Bar v. Kleindienst,* 345 A.2d 146 (D.C.1975) (en banc).[9] He also contends that the three-month suspension is inconsistent with sanctions that have been imposed in comparable cases. *See In re Reback,* 513 A.2d 226 (D.C.1986) (en banc). He primarily argues that his sanction is inconsistent with that imposed in *In re Austern,* 524 A.2d 680 (D.C.1987). In contrast, Bar Counsel has adopted the position of the minority of the Board and has argued that a nine-month suspension is appropriate because Sandground engaged in a pervasive, dishonest, and arranged scheme to defraud Mrs. Powell and to prejudice the administration of justice.

■ One argument can be disposed of at the outset. Sandground also contends, in his reply brief, that the court should defer to the Committee's recommended sanction of public censure, as opposed to the Board's recommendation, because only that body was in a position to evaluate demeanor evidence. The respective roles of the committee, the board, and the court are well known. *See In re Rosen,* 481 A.2d 451 (D.C.1984). Sandground does not challenge the findings that he violated the three disciplinary rules and concedes in his reply brief on appeal that the Board adopted the Committee's findings in all relevant respects. Moreover, in its review, this court "shall accept the findings made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended decision *of the Board* unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." D.C. Bar R. XI, § 7(3) (emphasis supplied). The court ordinarily defers to the Board's recommended sanction when it is reasonable. *See In re Smith,* 403 A.2d 296, 303 (D.C.1979) (unreasonable or abuse of discretion). Finally, our review of the record leads us to the conclusion that the Board adopted the same view of Sandground's character and the events as did the Committee; they differed as to the seriousness of the violation, a determination that is the primary responsibility of the Board.

■ We also cannot agree with Sandground's claim that the recommended sanction of a ninety-day suspension is unwarranted. Numerous factors must be considered in imposing a specific discipline, including "the nature of the violation, the mitigating and aggravating circumstances, [and] the need to protect the public, the courts, and the legal profession." *In re Haupt,* 422 A.2d 768, 771 (D.C.1980). The court agrees with the Board's evaluation of the seriousness of the offense, *Reback, supra,* 513 A.2d at 230–31, and finds that the Board gave appropriate consideration and weight to the other relevant factors. The record reveals that the Board expressly considered and weighed Sandground's unblemished disciplinary record and his excellent reputation, as testified to by notable character witnesses.[10] More importantly,

---

8. Sandground presented an impressive array of character witnesses.

9. This court has distinguished *Kleindienst, supra,* and overruled it to the extent that it may be inconsistent with our decision in *In re Hutchinson,* 534 A.2d 919, 927 (D.C.1987) (en banc).

10. Sandground advances his contrition as a mitigating factor. Bar Counsel responds that his lack of contrition should be an aggravating factor. Sandground has protested certain facts below, but not the seriousness of the alleged violation, and that his attitude should be considered a neutral factor. *Compare In re Stanton,* 470 A.2d 272 (D.C.1983). We might consid-

we agree with the Board's assessment of the severity of Sandground's violation and its determination that, considering the factors in mitigation, a three month suspension is appropriate. Knowing participation in an attempt to conceal funds is a serious ethical transgression no matter how well-intentioned with respect to one's friend and client. The practice of law demands rigid honesty from attorneys if justice is to prevail. The obligation to serve one's client does not justify gaining the client an advantage by ethically impermissible tactics. Moreover, the level of disciplinary sanctions must preserve the system's interest in unflinching honesty. Thus, even if we could be convinced that Sandground would never let his judgment be swayed again, a sanction that is reasonably commensurate with the seriousness of his conduct in this instance must nonetheless be imposed. *See Reback, supra,* 513 A.2d at 231 ("deter other attorneys from engaging in similar conduct").

We also defer to the Board's consideration of all the relevant factors in our rejection of Bar Counsel's argument that Sandground be suspended for nine months. Under D.C. Bar R. XI, § 7(3) we will "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." *See Rosen, supra,* 481 A.2d at 454 and cases cited. In our view, Bar Counsel has overstated the gravity of the findings of the Board, which in fact exonerated Sandground of participation in an extensive, arranged conspiracy. See note 5, *supra.* Bar Counsel also understates the Board's ability to consider mitigating factors.

Sandground's claim of inconsistency is also without merit. This court has often stated that, "[w]ithin the limits of the mandate to achieve consistency, each case must be decided on its particular facts." *Haupt, supra,* 422 A.2d at 771; *see also Reback, supra,* 513 A.2d at 231. The court agrees with the Board that the sanction imposed in this case is consistent with that imposed in other misrepresentation cases.[11] Specifically, Sandground's behavior is more serious than the conduct in *Rosen, supra,* 481 A.2d at 455, where the attorney made three false statements to a court for the mere purpose of obtaining a continuance. Sandground's knowing participation went to the heart of the controversy between Powell and his wife and threatened to defraud Mrs. Powell. On the other hand, we do not disagree with the Board's conclusion that Sandground's conduct is somewhat less serious than the actions in *Reback, supra.* There, two attorneys attempted to protect themselves by covering up multiple instances of neglect through the false signing and notarization of a client's signature; they then presented these falsified pleadings to the court and lied to the client about the progress of the case, thereby violating both their duty to the court and their duty to their client. By contrast, Sandground temporarily allowed himself to become a participant in one attempt by his client to conceal funds to the potential detriment of Mrs. Powell, in violation of his duty to the court.

Respondent contends, finally, that the disposition of one recent case is inconsistent with his sanction. In *In re Austern, supra,* 524 A.2d 680, the court accepted the Board's recommended sanction of public censure for violations of DR 1–102(A)(4) and DR 7–102(A)(7) that arose out of an attorney's assistance in closing a real estate transaction. Austern acted as one of two escrow agents even though he knew that his client's account contained insufficient funds; he held the check until the client forwarded the appropriate funds. The court stressed that Austern was swayed by animosity within that particular

---

er Sandground's inconsistent positions before the Board to be an aggravating factor, but defer to the Board's treatment of this matter. We find it anomalous that, on appeal, Sandground is simultaneously urging contrition as a mitigating factor and still attempting to argue the admissibility of essentially exculpatory evidence.

11. The Board found Sandground's case to be most similar to *In re Thomas,* M–94–81 (D.C. Mar. 1, 1982), an unpublished opinion upholding a three month suspension. When representing himself in a case, Thomas had submitted a false response to interrogatories and given an untruthful answer in a deposition.

attorney-client relationship and the desire to bend over backwards in order to fulfill his obligations and to preserve client confidentiality. A professor of legal ethics, Austern also did not seek to advance his personal interests. He was also assured that the funds would be forthcoming. By contrast, Sandground's actions threatened to advance the pecuniary interests of a personal friend at the expense of his friend's wife. Conflicts between the disciplinary code and the illicit advancement of a friend's pecuniary interest, however, did not even arguably confront Sandground with a legitimate ethical dilemma. Austern, to the contrary, felt that he was confronted with a choice between disclosure of his client's deed and honoring his client's confidence. Moreover, Sandground's actions posed a greater threat to the administration of justice and involved dishonesty in a judicial proceeding. As the Board observed: "The proper functioning of our legal system depends in large part on the premise that lawyers will assist their clients in complying with applicable legal rules during pre-trial discovery and will not participate in any efforts to create false evidence or to conceal the truth."

Accordingly, it is ORDERED that Mark B. Sandground be, and hereby is, suspended from the practice of law in the District of Columbia for ninety days, effective thirty days from the date of this opinion.