**In re Robert R. GOFFE, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 90–BG–888.**

District of Columbia Court of Appeals.

Argued Jan. 4, 1994.

Decided May 5, 1994.

■

---

**2.** *See also Overholser v. O'Beirne,* 112 U.S.App. D.C. 267, 270–71, 302 F.2d 852, 853–56 (1961).

Michael S. Frisch, with whom Elizabeth A. Herman, Asst. Bar Counsel, and Wallace E. Shipp Jr., Deputy Bar Counsel, Washington, DC, were on the brief, for Office of Bar Counsel.

Joan L. Goldfrank, Executive Atty., Washington, DC, for Bd. on Professional Responsibility.

Karen B. Lipson, with whom Steven M. Umin, Washington, DC, was on the brief, for respondent.

Before STEADMAN, FARRELL * and KING, Associate Judges.

PER CURIAM:

Before us is a case of conduct by a member of our Bar that involves not only a pattern of dishonesty and lying but blatant fabrication and creation of evidence. The Hearing Committee recommended a suspension of three years with a fitness requirement,[1] noting that if it felt free to do so under existing precedent, it would have recommended disbarment. The Board on Professional Responsibility, apparently deeming itself restricted by *In re Hutchinson,* 534 A.2d 919 (D.C.1987) (en banc) (one-year suspension for lying under oath to Securities and Exchange Commission), has recommended a one-year suspension with a requirement of fitness.[2] We think the case

---

* Former Chief Judge ROGERS was a member of the division that heard oral argument in this case. After her departure from the court, Associate Judge FARRELL was selected by lot to replace her.

1. Under D.C. Bar R. XI, § 3(a)(2), a suspension may not be imposed for a period greater than three years. The court may include a fitness requirement as a condition of reinstatement. *Id.*

Disbarment involves a minimum period of five years. *See In re McBride,* 602 A.2d 626 (D.C. 1992) (en banc).

2. To the Hearing Committee Bar Counsel recommended disbarment. Now before this court, Bar Counsel suggests a three-year suspension and a showing of fitness prior to reinstatement.

before us involves egregious misconduct of a scale far beyond *Hutchinson*. We conclude that prior precedent does not limit possible sanctions in attorney dishonesty cases to a suspension and that the misconduct here is of a magnitude compelling disbarment. Accordingly, we order respondent disbarred from the practice of law in the District of Columbia.

## I.

Respondent has been a member of this bar since May 9, 1978. In March 1992, respondent was charged with ethical violations, arising out of two separate incidents, involving DR 1–102(A)(4) (dishonesty, fraud, deceit, and misrepresentation), DR 1–102(A)(5) (conduct prejudicial to the administration of justice), and DR 7–102(A)(4) (knowing use of false evidence). The Hearing Committee made some forty-five pages of detailed findings of facts which may be summarized as follows.

The first incidents of misconduct arose out of the representation by respondent of his fiancee before the IRS and the Tax Court involving substantiation of rental expenses and charitable deductions claimed by respondent's fiancee for the 1982 tax year. Essentially, the respondent proffered fabricated or altered evidence to the IRS, made false statements to IRS counsel, and lied under oath before the Tax Court. In a 1985 meeting between respondent and an IRS attorney respondent tendered, in support of the deductions, a copy of a "$7000 check," and a copy of a church contribution form. Both of these documents were manufactured evidence, as respondent knew.

The proffered check was originally written for $40 and had been altered to purport to be a check for $7000, the amount of the claimed rental expense deduction. In a subsequent telephone conversation with an IRS attorney, respondent again contended that the check, which he had already presented to the IRS, represented a rent payment from his fiancee to support the claimed deduction. During

the trial before the Tax Court on the claimed deductions, respondent lied under oath to the court denying, in the entirety, his involvement with the check tender.[3] Then to the Hearing Committee, again respondent lied, saying that he had not tendered a copy of the check as substantiation and that he had not said that the check was a rent payment in a subsequent phone conversation with an IRS attorney. The Hearing Committee concluded that respondent knowingly presented an altered check with an intent to deceive, and lied to both the Tax Court and the Hearing Committee about its origin and his involvement.

The church contribution form purported to evidence contributions made by respondent's fiancee to the church which never were, in fact, made. The document was an official printed form used by the church to record donations. However, the form was not prepared by church officials nor sent by the church to respondent's fiancee. The church had no record of the contributions shown. Again respondent tendered this form, in the IRS conference, as the only document to substantiate the charitable deduction. At the trial before the Tax Court on the claimed deductions, respondent lied under oath saying that he had not tendered the form. At the Hearing Committee hearing, respondent acknowledged that he had tendered the form, but denied that he used it as substantiation. Both documents were proffered with both the knowledge of their falsity and the intent to deceive the IRS as to the claimed deductions. The Hearing Committee concluded that respondent presented these two false documents "which were not what they appeared to be, in an effort to substantiate [his fiancee's] position," evidencing a pattern of misrepresentation and deceit.

The second incidents of misconduct originated from certain real estate transactions between respondent and a neighbor, Arnold Kuperstein, and certain events in the related civil litigation between respondent and a ten-

---

**3.** Respondent denied that he provided the copy of the check to the IRS as substantiation; he

denied depositing the check in his account; and

ant, John Pickard.[4] The Hearing Committee found that respondent fabricated elements of three documents, a subdivision agreement, an easement agreement and reciprocal leases, and that he had completely fabricated a letter to support his negotiations with Mr. Kuperstein.

In January 1983, respondent and his neighbor, Mr. Kuperstein, executed a subdivision agreement ["January 1983 subdivision agreement"] regarding two townhomes and five garages they originally had owned as tenants in common.[5] The agreement provided that the parties would apply to subdivide the lot. As a result of the subdivision, each party would own one townhouse outright and Mr. Kuperstein would own garage number one and respondent garages two, three, four, and five. The agreement also specified that if they could not subdivide the townhouse and garages, then they would enter into either reciprocal leases or easement agreements to satisfy that end. Mr. Kuperstein

did sign the January 1983 subdivision agreement but never notarized nor recorded it with the Recorder of Deeds. Mr. Pickard, respondent's tenant, later found the January 1983 subdivision agreement notarized and recorded in the record of deeds. The notary public, whose purported signature appeared on the agreement, testified that she never recalled notarizing this document or any other nor did it appear in her log of notarizations. The Hearing Committee concluded that respondent had fabricated the notarization of the January 1983 subdivision agreement and then filed it with the Recorder of Deeds. Respondent then lied to the Hearing Committee about these events.

In October 1983 respondent provided to Mr. Kuperstein proposed reciprocal leases, ["October 1983 reciprocal leases"] allegedly approved by a lawyer. After receiving advice from an attorney, Mr. Kuperstein did not sign the leases but instead commissioned his lawyer to draft an easement agreement.

stated that he never saw the check until an IRS attorney showed him a copy.

4. *See Goffe v. Pickard*, 588 A.2d 265 (D.C.1991). The townhomes and garages at issue in this civil litigation were located on the same lot and Arnold Kuperstein and respondent originally owned the townhomes as tenants in common. Each owned an undivided one-half interest. Each of the townhomes have private patios in the rear and beneath them were five garages which opened into an alley. *Id.* Mr. Kuperstein and respondent had executed a subdivision agreement that stated their intent to subdivide the lot and that each would own one townhouse outright and that Mr. Kuperstein would own garage number one and respondent would own garages two, three, four, and five. *Id.* at 267. The agreement also provided that if the subdivision could not be effectuated the parties would execute either reciprocal leases or an easement agreement. *Id.* Thus because of the existing subdivision agreement, John Pickard leased one townhouse and garage number 5 from respondent. *Id.* at 266. Soon after settlement, the roof of the garage began to leak and Mr. Pickard repeatedly contacted respondent asking him to repair the condition. *Id.* at 266–267. Respondent disclaimed all responsibility for the problem. *Id.* at 267. The roof could not be repaired without entering onto the patio of Mr. Kuperstein's townhouse. Mr. Pickard again wrote to the respondent stating that he thought that respondent and Arnold Kuperstein had executed an easement agreement giving respondent a right of egress on Mr. Kuperstein's patio. *Id.* Respondent again denied any responsibility for the repair. *Id.*

Then fearing a cloud of title on his leasehold interest, Mr. Pickard discovered, in the Recorder of Deeds, the executed and notarized subdivision agreement but could not find any easement agreement or reciprocal lease. *Id.* Mr. Pickard then met with Mr. Kuperstein who confirmed the existence of a signed subdivision agreement. *Id.* at 267–68. Mr. Kuperstein also stated that neither reciprocal leases nor an easement agreement had yet been executed. *Id.* After repeated requests for a copy of the purported easement agreement from respondent, Mr. Pickard brought suit for good leasehold title. During his deposition respondent finally produced a copy of an "executed and notarized May 21, 1984 easement agreement." *Id.* at 268. After a bench trial, the trial court found that respondent had forged Mr. Kuperstein's initials on important deletions in part of the text of the easement agreement. *Id.* The trial court also concluded "that at his deposition [and in response to the document request, respondent] knowingly presented a false document to support his defense in this lawsuit." *Id.* We concluded that there was no basis for disturbing the trial court's credibility determination inherent in the dispute. *Id.* at 271.

The Hearing Committee did not rely on the trial court's findings of fact nor conclusions of law in reaching its decision regarding respondent's misconduct because the trial court's findings were made under a preponderance of evidence standard and the findings by the Hearing Committee were decided based on clear and convincing evidence.

5. See *supra* note 4.

In September 1987 Mr. Pickard scheduled a meeting to discuss the garage leases with Mr. Kuperstein, Ms. McKaig, another tenant of respondent's, and Mr. Pickard's lawyer. At the meeting, Ms. McKaig produced copies of the October 1983 reciprocal leases, given to her by respondent, allegedly notarized and executed by respondent and Mr. Kuperstein.[6] Mr. Kuperstein expressed surprise and informed the other attendees that the signature and notarization were forgeries. Again the notary public had no recollection of notarizing this document, despite her purported signature appearing on the document. The Hearing Committee found that with respect to the October 1983 reciprocal leases respondent had forged Mr. Kuperstein's signature and then falsely notarized it.

After the October 1983 reciprocal leases had been rejected, in March 1984, respondent insisted that he and Mr. Kuperstein come to some agreement about the leases of the garages and if no agreement were reached, he would sue for specific performance of the January 1983 subdivision agreement. On May 21, 1984, Mr. Kuperstein sent respondent, by certified mail, a proposed easement agreement ["May 1984 easement agreement"] with a cover letter asking him to sign it and to file it with the Recorder of Deeds. The agreement had been executed by Mr. Kuperstein and properly notarized. Respondent never returned an executed copy of the May 1984 easement agreement to Mr. Kuperstein.

On August 4, 1987, Mr. Kuperstein sent respondent a letter, complaining that respondent had leased garages without authority. This August 4, 1987 letter withdrew the offer of the May 1984 easement agreement. Mr. Kuperstein never received any response from respondent. In January 1989, Mr. Kuperstein received a letter from respondent asserting his authority to lease the garages in the townhomes pursuant to the terms of the "May 1984 easement agreement." Respondent also insisted that Mr. Kuperstein file the May 1984 easement agreement with the Recorder of Deeds. Respondent had attached a copy of a "August 7, 1987" letter

which was allegedly in response to Mr. Kuperstein's letter of August 4, 1987. The August 7, 1987 letter stated that respondent had executed the May 21, 1984 easement agreement. This August 7, 1987 letter was completely fabricated by respondent.

The "May 21, 1984 easement agreement" finally appeared when respondent produced a copy of it at his deposition in the civil litigation with Mr. Pickard. The Hearing Committee found that respondent had altered paragraphs of the easement agreement by crossing out important sections of the text that Mr. Kuperstein specifically wanted and that respondent had forged Mr. Kuperstein's initials on those paragraphs. The Hearing Committee found that "[h]e did so intentionally and knowingly, with the intention to mislead, and with the intention to use the document to his financial advantage by using it as evidence in pending litigation. Respondent did, in fact, produce the forged document in the then-pending Pickard litigation, and he since has testified falsely about his conduct."

## II.

■ A recommendation of the Board on Professional Responsibility with respect to a proposed sanction comes to us with a strong presumption in favor of its imposition. *Hutchinson*, 534 A.2d at 924. Court Rules require that we "shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(g). The imposition of sanctions in bar discipline, as with criminal punishment, is not an exact science but may depend on the facts and circumstances of each particular proceeding. *In re Haupt*, 422 A.2d 768, 771 (D.C.1980) ("Within the limits of the mandate to achieve consistency, each case must be decided on its particular facts"). Generally speaking, if the Board's recommended sanction falls within a wide range of

6. The parties stipulated at the hearing that Ms. McKaig's attorney who represented her in the lease negotiations with respondent had these leases in his file.

acceptable outcomes, it will be adopted and imposed.[7]

Ultimately, however, the system of attorney discipline, including the imposition of sanctions, is the responsibility and duty of this court. *Hutchinson,* 534 A.2d at 924. "When the court disagrees with the Board as to the seriousness of the offense or the demands of consistency, however, the Board's recommendations are accordingly granted less weight." *In re Kennedy,* 542 A.2d 1225, 1228 (D.C.1988) (citing *In re Reback,* 513 A.2d 226, 230–31 (D.C.1986) (en banc)). More specifically, decisions of this court can serve as overall guidelines to assist in defining the permissible range of sanctions. This is such a case, for we significantly disagree with the Board's reading of our en banc decision in *Hutchinson* and other cases involving attorney dishonesty. As we previously noted with respect to *Reback* and *Hutchinson,* neither case was intended to establish a ceiling on the sanction imposed on an attorney who has engaged in dishonest conduct or misrepresentation. *See Kennedy,* 542 A.2d at 1229. The fact that no case previously has imposed a sanction greater than one year for attorney dishonesty does not mean that such a period of suspension, even when coupled with a requirement of fitness, is any sort of tacit outer limit. Rather, it simply evidences that no such example of attorney dishonesty of the magnitude of that demonstrated here has previously been presented to this court.

We iterate briefly the applicable principles. To determine what discipline is appropriate under the circumstances, we review the respondent's violations in light of all the relevant factors. *Reback,* 513 A.2d at 231. These factors include (1) "the nature of the violation, [ (2) ] the mitigating and aggravating circumstances, [ (3) ] the need to protect the public, the courts, and the legal profession," *Hutchinson,* 534 A.2d at 924, and (4) the moral fitness of the attorney. *Id.* (citing *In re Smith,* 403 A.2d 296, 303 (D.C. 1979)). The purpose of imposing discipline is to serve the public and professional interests identified and to deter future and similar conduct rather than to punish the attorney. *Kennedy,* 542 A.2d at 1231; *Hutchinson,* 534 A.2d at 924. We now turn to the case before us.

### III.

In brief, with respect to the four factors just mentioned, we are struck in this case by the following: the egregious character of the misconduct and its repetitive nature; the need to protect the public and the governmental and judicial system against the blatant fraud evidenced here; the absence of any significant mitigating circumstances; and the reluctance of the respondent to this day to indicate contrition or recognition of the seriousness of the offenses.

What most markedly distinguishes this case from any that we have previously seen is the repeated resort not only to false testimony but to the actual manufacture and use of false documentary evidence in official matters.[8] "Documents are an attorney's stock in trade, and should be tendered and accepted at face value in the course of professional activity." *In re Schneider,* 553 A.2d 206, 209

---

7. We re-emphasize the general principle expressed in *Haupt,* 422 A.2d at 771:

   [T]he rule endorses the Board's exercise of broad discretion in handing out discipline that is subject only to a general review for abuse in that discretion's exercise. The rule requires that we enforce a general sense of equality in the sanctions handed out, but it otherwise commands that we should respect the Board's sense of equity in these matters unless that exercise of judgment proves to be unreasonable.

8. "Lying to an agency of the federal government is a felony under the laws of the United States, punishable by imprisonment for five years or a fine of $10,000 or both." *Hutchinson,* 534 A.2d

at 924; 18 U.S.C. § 1001 (1989). Knowingly using a false writing or document in any matter with the United States or its agency is also a felony. 18 U.S.C. § 1001 (1989). Moreover, lying under oath is perjury. 18 U.S.C. § 1621 (1989); D.C.Code § 22–2511 (1989). A person is guilty of forgery and uttering if he or she makes a forged written document, one either falsely made, altered or signed, or if he or she uses, presents or issues such forged document. D.C.Code §§ 22–3841(a)(1), (a)(2), (b) (1989). If respondent had been charged and convicted of these felony crimes, he almost certainly would have been disbarred. *See, e.g., In re Colson,* 412 A.2d 1160, 1164–67 (D.C.1979).

(D.C.1989). Respondent manufactured evidence for use before the IRS, lied under oath to the Tax Court, and continued to lie about his actions to the Hearing Committee. In the civil dispute, he forged signatures to documents on which the purported signer had no intent ever to be bound [9] and falsely notarized documents, all in order to obtain an economic benefit. He used the forged agreements to support his position. He testified about this falsified document in the course of disciplinary proceedings before the Hearing Committee. His conduct showed a pattern of dishonesty and fabrication of evidence over a number of years, in contrast to Hutchinson's isolated lies to the SEC. *See Hutchinson*, 534 A.2d at 920–21. The repeated fabrication and falsification of documents and related lying created the prospect of injustice and unfair advantage with respect to a range of governmental institutions as well as to private individuals.[10] *Reback*, 513 A.2d at 231.

■ Moreover, again in contrast with *Hutchinson*, respondent's record presents no significant mitigating factors.[11] The Hearing Committee's analysis of this issue is cogent and we quote it here.

Foremost, respondent's conduct in tendering fabricated documents would constitute a felony involving moral turpitude if it had been prosecuted. In *Hutchinson*, the Court of Appeals was clear that the criminality of unethical conduct is an aggravating factor. 534 A.2d at 927. If respondent had been charged with a crime and convicted for his conduct (e.g., false statement, obstruction of justice, fraud), he likely would be disbarred pursuant to statute.

*See In re Micheel*, [610 A.2d 231 (D.C. 1992)].

Second, respondent did not engage in bad acts out of sympathy for another or because of the pressure of the moment. In each of the cases before us, his conduct was part of a plan to commit fraud intended to benefit himself, indirectly in the tax case and directly in the real estate case. Indeed, in each context he seemed determined to use every deception he could to accomplish a premeditated, illicit end. *Cf. In re Sandground*, 542 A.2d 1242 (D.C.App.1988) (misrepresentation to help friend not part of preconceived plan).

Third, respondent's misconduct was related to the practice of law. *In re Kennedy*, 542 A.2d 1225 (D.C.App.1988). This was clearest in the tax case, in which he represented his future wife. Although, the real estate case did not involve the representation of a client, the filing of documents and production of evidence in litigation lies at the heart of what lawyers do.

Fourth, there is the pervasiveness of the misconduct at various times and in different situations. In many respects the breadth and repetition of respondent's misconduct involves the considerations at play when prior discipline is considered as an aggravating factor. *See In re Waller*, 573 A.2d 780 (D.C.App.1990) (prior discipline considered). Specifically, the committee concludes that respondent has chosen to use deceit and misrepresentation as a principal means of dealing with the legal system. This is of particular concern because respondent apparently has not been engaged in the active practice of law for a long time; yet, when he has been involved

---

9. While the respondents in *Reback*, 513 A.2d at 228, also forged their client's signature on a complaint and falsely notarized it, the complaint was substantively identical to that previously signed. Here, in contrast, the forged and falsely notarized signature was on an agreement by which the person whose signature was forged at no time intended to be bound. In *Schneider*, 553 A.2d at 211, another instance in our judicial system involving the use of false documents, it was undisputed that Schneider was entitled to the expense money for which he made claim to his private employer.

10. Contrast our observation in *Hutchinson* that such protection was "less important ... given the isolated nature of the incidents which constituted the misconduct and the fact that they were unrelated to any court proceeding." *Hutchinson*, 534 A.2d at 924.

11. Mitigating factors in *Hutchinson* included a distinguished career in government and private practice, a voluntary recanting of false testimony, the voluntary surrender of profits made, the occurrence of misconduct during a period of tremendous emotional stress, full cooperation with Bar Counsel, and the participation in psychiatric counseling. *Hutchinson*, 534 A.2d at 924–25.

in the legal system, he has approached the system from a perspective of entrenched dishonesty.

Fifth, respondent's misconduct operated to the prejudice of the IRS and those involved in the real estate transactions.

Finally, there is no suggestion that respondent understands the impropriety of his conduct. A respondent is entitled to require proof of his misconduct and to contest the existence of the misconduct or the appropriateness of particular sanctions. But respondent testified falsely about his conduct. It is not just that the evidence was contrary to his testimony. Seeing him and hearing him as a witness, the committee was left with the strong impression that he had testified falsely, as he had done earlier in the Tax Court and in Superior Court. This conduct is quite different from the conduct of others who, having made the decision to testify falsely, thought the better of it at a later time and voluntarily gave the truth to authorities. *See In re Hutchinson,* 534 A.2d 919 (D.C.App.1987); *cf. In re Waller,* 573 A.2d 780 (D.C.App.1990) (no remorse, but did not testify falsely).

It is true that respondent has no prior disciplinary record, a factor that we have taken into account in mitigation. *Reback,* 513 A.2d at 233; *In re Rosen,* 481 A.2d 451, 455 (D.C.1984); *In re Cope,* 455 A.2d 1357, 1361 (D.C.1983). Here, however, even without regard to respondent's difficulties with the United States Tax Court,[12] we have a pattern of conduct repeated over an extended time period in distinct and separate circumstances. Moreover, it is hardly necessary for an attorney to come into contact with the disciplinary system in order to become aware that the falsification of evidentiary documents is not remotely acceptable ethical behavior. Thus, the mitigating elements normally presented by a prior clean record—the isolated nature of the ethical violation, its unlikeliness to recur, and the educational

benefit of a disciplinary proceeding—are virtually absent here.

■ Respondent also argues that his misconduct here was not related to the practice of law. We cannot agree. The respondent, in assisting his fiancee in the IRS matter, was defending her in the fundamental way that lawyers act. Likewise, in the civil case, in presenting known false evidence in discovery, he was acting within the familiar arena of attorneys; the fact that he did so as a party rather than in the role of attorney is irrelevant. This case thus bears no resemblance to, for example, *Kennedy,* 542 A.2d at 1227, where the misstatements were made in connection with a personal bank loan.[13]

■ The last factor is the moral fitness of the respondent to practice law. This is placed into serious question by the misconduct here. Moreover, respondent's role in the course of these disciplinary proceedings was in marked contrast to such cases as *Hutchinson* and *Reback,* where the attorneys quickly came to realize and freely acknowledge the totally unacceptable nature of their misconduct and fully cooperated in the disciplinary process and in making amends for the misconduct.

## IV.

We thus conclude that the misconduct here, with its related factors, extends by orders of magnitude beyond *Hutchinson,* which the Board considered most closely approximated respondent's situation. *Rosen,* 570 A.2d at 728, the other case thought by the Board to be comparable, is also in our view significantly different. The misconduct in *Rosen* did not involve blatant fabrication of documents or forgery. There, the attorney recklessly executed an oath in the Maryland Bar admission application which specifically stated that no changes in personal status had occurred, where in fact the attorney had been subject to disciplinary proceedings in

---

**12.** In a separate disciplinary proceeding, the United States Tax Court disbarred respondent due to the conduct arising out of the tax proceedings; however, the order was vacated due to serious procedural defects. The Board noted that respondent did resign from practice before

the Tax Court while facing a new investigation into his professional conduct.

**13.** *See also Hutchinson,* 534 A.2d at 920–21 (attorney lied to cover personal involvement in insider trading).

Maryland. *Id.* at 729. This court suspended Rosen for nine months due to his prior disciplinary record in Maryland and the District, *id.* at 728, 730, and we concluded that Rosen recklessly misrepresented material facts in applying for admission, in violation of DR 1–101(A). *Id.* at 729–30.

Perhaps more to the point, and illustrative of our concern in matters of attorney dishonesty, is *In re Garner*, 636 A.2d 418 (D.C.1994).[14] In that reciprocal disciplinary case, we, following the New York authorities, disbarred Garner who twice lied on a sworn application to the Office of the Comptroller of the United States Currency and who had a significant prior record of professional misconduct. *Id.* at 419–20. On his sworn application Garner failed to disclose that a New York disciplinary proceeding was pending as required in the application. *Id.* at 419. Then on a second sworn document filed later, he again lied about the pending proceeding. *Id.* Garner lied so he could be recognized as an organizer and director of the proposed bank. *Id.* His prior discipline involved two incidents of fabrication of names and signatures of adopting parents on hospital documents in California. *See In re Garner*, 576 A.2d 1356, 1356 (D.C.1990). Garner, as did respondent here, invoked *Hutchinson* as proper guidance for the sanction. We rejected that argument, concluding that the attorney's misconduct "warrants a significantly more severe sanction than we imposed in *Hutchinson.*" *Garner*, 636 A.2d at 422. We recognized the isolated nature of Hutchinson's misconduct and his clean record, as contrasted with Garner's record of several prior disciplinary actions. *Id.* With respect to the argument that disbarment was a sanction "substantially different from what would be imposed if the case had arisen in the District of Columbia," we agreed with the Board that "disbarment is well within the range of sanctions for similar misconduct in

the District of Columbia. *See, e.g., In re Gilbert*, 538 A.2d 742, 746 (D.C.) (failure to disclose material information on Maryland Bar application warrants reciprocal disbarment where such misconduct would incur similar discipline if it occurred in the District of Columbia), *cert. denied*, 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 56 (1988)." *Id.* at 421.

Reliance is misplaced on such misrepresentation cases as *In re Robertson*, 618 A.2d 720 (D.C.1993) (misrepresented that a Washington Post reporter was his assistant or an attorney to gain admittance to restricted cell-block); *In re Jones*, 599 A.2d 1145 (D.C.1991) (attorney did not disclose representation of husband in inducing wife and child to sign a recantation affidavit); *In re Garner*, 576 A.2d 1356 (D.C.1990) (forged client signatures on document submitted to hospital); *In re Greenspan*, 578 A.2d 1156 (D.C.1990) (misstatements to bank and in disciplinary action); *In re Waller*, 573 A.2d 780 (D.C.1990) (lied to court about statement made to mediator); *In re Sandground*, 542 A.2d 1242 (D.C.1988) (assisted client in concealment of assets); *In re Thompson*, 538 A.2d 247 (D.C. 1987) (made false statements to immigration authorities); and *In re Fogel*, 422 A.2d 966 (D.C.1980) (lied to client about status of neglected appeal). None of the misconduct in these cases begins to approach that of respondent. *Inter alia*, in virtually all of these cases the misconduct, even if repeated, stemmed from the same general event or circumstances, not a pervasive and distinct series of actions as here.[15] Nor did they involve the deliberate and knowing falsification of documents for use in government and court proceedings for personal economic gain.

Although the misconduct here appears unprecedented in our jurisdiction, other jurisdictions have treated similar situations with severity. In two jurisdictions, the attorney

---

14. Neither the Board nor the Hearing Committee had the benefit of *In re Garner*, which was decided by this court after their reports had been made.

15. In *Greenspan*, the misconduct did arise from two unrelated events. One was the subject of

reciprocal discipline in which mitigating factors were present. The other led to a disciplinary proceeding for failure to attend meetings with an auditor-master and non-cooperation with Bar Counsel, which included an apparent evidentiary fabrication of a letter to Bar Counsel.

was suspended for five years for falsifying documentary evidence for use in his own behalf. *In re Stump*, 621 P.2d 263 (Alaska 1980); *In re Dedman*, 550 P.2d 1040 (Calif.1976). In four jurisdictions, the attorney was disbarred for forging the signature of a client and creating false evidence, *In re Wallace*, 265 Ind. 292, 354 N.E.2d 213 (1976); notarizing a document and forging a client's signature, *In re Easler*, 275 S.C. 269, 269 S.E.2d 765 (1980); and knowingly submitting false evidence to the INS, *Weir v. State Bar*, 23 Cal.3d 564, 152 Cal.Rptr. 921, 591 P.2d 19 (1979) or to the Board on Professional Responsibility, *In re Hetland*, 275 N.W.2d 582 (Minn.1978).

## V.

We agree with the Board that "there is no doubt that the misconduct involved in these matters is extremely serious." We also agree with its observations that:

the Board is deeply troubled by the misconduct displayed by Respondent in these two unrelated matters. The record gives one the sense that Respondent has shown no compunction against altering documents in order to achieve a desired end. The use of forged documents in two wholly unrelated matters demonstrates [a] disturbing pattern of dishonesty and justifies the imposition of a showing of fitness prior to Respondent's reinstatement.

We also concur with the Hearing Committee's assessment that

[t]his case is more serious than previous cases, however, because of respondent's repeated dishonesty, because of the persistence of his false testimony about that dishonesty, and because the use of wholly fabricated evidence is more outrageous than the use of documents and statements that include misrepresentation. The use of

wholly fabricated evidence should be unthinkable for lawyers.

However, we do not agree with the Board's and Hearing Committee's recommended sanctions. The Hearing Committee felt bound by a sanction of suspension concluding that "the Court of Appeals has written that there is no 'ceiling on the suspension to be imposed on an attorney who has engaged in dishonest conduct.' *In re Hutchinson*, 534 A.2d 919, 925 (D.C.App.1987) (en banc) (emphasis added). The implication is that suspension, not disbarment, is the appropriate sanction for dishonesty, fraud, deceit, and misrepresentation." The Board also seemed constrained by the lack of attorney dishonesty "cases which impose a suspension longer then a year and a day."

We do not agree that *Hutchinson* was intended to limit possible sanctions in attorney dishonesty cases to a maximum three year suspension.[16] As we have previously noted, neither *Hutchinson* nor *Reback* "purported to establish a ceiling for misrepresentation cases." *Kennedy*, 542 A.2d at 1229. The seriousness and pervasiveness of the pattern of misconduct here is unparalleled in this jurisdiction. Indeed, the misconduct is more severe than the misconduct in *Garner*, *supra*, where we concluded, as already noted, that "disbarment is well within the range of sanctions for similar misconduct in the District of Columbia." *Garner*, 636 A.2d at 421. The strictness with which other jurisdictions have dealt with similar misconduct is also persuasive. Respondent's pattern of misconduct, the absence of meaningful mitigating factors, and the need to protect the public and governmental institutions warrant a sanction consistent with *Garner*.

It is therefore ORDERED that respondent, Robert R. Goffe, be disbarred from the practice of law in the District of Colum-

---

16. At the time *Hutchinson* was decided in 1987, our disciplinary rules permitted suspension of any period "not in excess of five years." D.C. Bar R. XI, § 3(2) (1987). An attorney disbarred under our disciplinary rules could reapply for reinstatement after five years, *id.* § 21(2); an attorney disbarred under D.C.Code § 11–2503(a)

was banned permanently. Under our present rules and case law, a suspension may not exceed three years and an attorney disbarred for whatever reason may reapply after five years. See *supra* note 1. Thus under our present system, a disbarment is effectively a minimum five-year suspension.

bia, effective 30 days from the date of this opinion.[17]

---

**17.** Respondent points out that as a consequence of his suspension by the U.S. Tax Court, he was suspended from the practice of law in the District of Columbia by order of this court from August 3, 1990, to March 6, 1991, and seeks credit for this period of suspension. However, we agree with the Board that respondent's failure to comply with the requirement of D.C. Bar R. XI, § 14(f) that an affidavit be filed, precludes any such credit. *In re Robertson,* 618 A.2d 720, 726 (D.C.1993). The fact that respondent claims that he had no clients in the District of Columbia at that time does not excuse the failure to file. With respect to the period of prospective disbarment, respondent's attention is drawn to D.C. Bar R. XI, § 16(c).